## WILLIS et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6578.

Circuit Court of Appeals, Ninth Circuit.

May 2, 1932.

La Verne L. Sullivan, Willis E. Sullivan, and Frank T. Wyman, all of Boise, Idaho, for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and Erwin N. Griswold, Sp. Assts. to the Atty. Gen. (C. M. Charest, Gen. Counsel, and J. Arthur Adams, and F. A. Surine, Sp. Attys., Bureau of Internal Revenue, all of Washington, D. C., of counsel), for respondent.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

JAMES, District Judge.

The Board of Tax Appeals confirmed the assessment made by the Commissioner of Internal Revenue against petitioners of income tax amounts for the years 1924 and 1925 in the respective sums of $3,052.24 and $5,672.65. Petitioners contend that the trust being administered by them was not an "association" within the meaning of the revenue law, and that the income accruing thereto was not subject to be taxed.

Petitioners are trustees under an instrument executed by devisees named in the will of John F. Broadbent, deceased, who died at Boise, Idaho, in the year 1922. Of the property of Broadbent's estate, twelve persons received equal undivided interests. This property consisted of 52 parcels of real estate, appraised at the time of distribution at a value

of $1,529,500. There were also three mortgages; two for the amount of $35,000 each, and one for the amount of $6,500. The real estate was largely improved by buildings; there was an office building containing 100 office rooms and 8 store rooms; also various other buildings, all rented for commercial purposes, such as restaurants, pool halls, a bank, etc. The devisees, believing that the property could not be equitably divided, notwithstanding that it was the desire of each to forthwith receive his or her allotted share, and failing to find immediate purchasers at what they considered fair values, concluded to pool their interests and form a trust. This they proceeded to do, and trustees were appointed to take over the property. It was at first provided that the trust should continue for a period of two years, i. e., from December 18, 1923, to December 31, 1925. On November 10, 1925, an agreement extending the trust to December 31, 1950, was entered into by the beneficiaries.

■ The trust agreement was very broad in those provisions which conferred power on the trustees. The purposes declared in the trust instrument were generally: "The *acquisition*, management, improvement and disposition of the trust property *and all such other property as may be acquired from time to time* for the benefit of the beneficiaries hereunder, and a division of the income, proceeds and avails of said trust property among the certificate holders as hereinafter provided." (Italics are added.)

Others of the very numerous provisions were appropriate, in the power given to the trustees, to enable the latter to fully carry out the purposes declared. For example, the trustees had discretion to distribute funds to the beneficiaries in such amounts as they chose during the trust term. They were authorized to borrow money; to use capital or income in the improvement of the property or in the *acquisition of other property*. Certificates were provided to be issued representing the several beneficial interests, which certificates were made freely transferable at the will of the holder. The power to fill vacancies caused by the retirement of any trustee was given exclusively to the remaining trustees. The terms of the trust agreement could only be changed with the consent of the trustees, but the beneficiaries alone had power to extend the life of the trust.

The collection of the income tax from this trust is justified by the Commissioner under the claim that the trust organization, in form and in its practice, is an "association" as that term is to be understood where used in the Revenue Act of 1924, § 2 (43 Stat. 253 [26 USCA § 1262]). Simply stated, the question is, did the trustees manage and operate the property in their charge as a business, with the purpose to accumulate a profit by the use of it, or was their sole purpose, intended and pursued, to dispose of it as rapidly as possible, market conditions considered, and divide the proceeds among the beneficiaries? As a liquidating trust purely, the income would not be taxable; as a business venture, the income would be taxable. The distinction is made clear in the cases: Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949; Blair v. Wilson Syndicate Trust, 39 F.(2d) 43 (C. C. A. 5); Commissioner v. Atherton, 50 F.(2d) 740 (C. C. A. 9); and whether beneficiaries are left much or little control is immaterial. Little Four Oil & Gas Co. v. Lewellyn, 35 F.(2d) 149 (C. C. A. 3); White v. Hornblower, 27 F.(2d) 777 (C. C. A. 1).

■ The question is to be determined from the facts showing what the trustees did in their handling of the property. The terms of the trust instrument are not conclusive, but they indicate the purpose in the minds of the beneficiaries, and are of significance when it is observed that the trustees assumed much of the power conferred upon them. During the year 1924, the trustees collected from rents and other sources $123,302.70, and expended $81,500. Of the total receipts, $118,804.44 represented rents collected. Three parcels of real estate were sold during the same year for the aggregate price of $12,000. And on the two mortgages $70,000 was collected. Broadbent, the testator, had sold fifty feet of the lot covered by the office building, and the building under the two ownerships was operated thereafter by the use of common elevators and common heating facilities. The trustees, in 1924, arranged to acquire back the fifty feet by exchanging for it a corner lot across the street. They paid a cash difference of $15,000. As a part of the exchange transaction they agreed to tear down a row of "shacks" on property owned by the trust, and located immediately in the rear of the lot they relinquished; they agreed to erect a new building on this property, which they did at a cost of $55,000. No other real property was acquired so far as the evidence showed. No sales of property were made in the year 1925. The total sales to June, 1930 (the trust had then operated for more than six years), amounted to $79,000. The certificate holders were regularly paid income amounts,

mainly in monthly installments. During the years 1924 and 1925, total disbursements to the beneficiaries amounted to $28,200 for each year. A regular office with a manager in charge was at all times maintained.

In their handling of the property, the trustees apparently used their best efforts to increase income and accrue profits. The exchange of property as noted, and the erection of a new building at a considerable cost, was considered without question as a profitable investment. Judged by their course of action as shown, it would be reasonable to assume that the trustees would continue to deal with the property in like manner as long as the trust remained alive. Such acts, as enumerated, gave to the trust operations the character of an active business enterprise. What constitutes the doing of business? Flint v. Stone Tracy Co., 220 U. S. at page 171, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. They went beyond transactions carried on for the single purpose of effecting a liquidation of assets; and for that reason the collection of an income tax was authorized under the terms of the revenue act.

The order of the Board of Tax Appeals is affirmed.