GORMAN LUMBER SALES COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13116.  Promulgated June 30, 1949.

*Bayley Kohlmeier, Esq.*, and *George H. Koster, Esq.*, for the petitioner.

*W. J. McFarland, Esq.*, for the respondent.

#### FINDINGS OF FACT AND OPINION.

TYSON, *Judge*: This proceeding involves excess profits tax deficiencies determined against petitioner by respondent in the amounts of $29,388.10 and $2,831.97 for the calendar years 1942 and 1943, respectively, and also involves the petitioner's claimed overpayment of its excess profits tax liability by the amount of $10,470.68 for the year 1943.

The issues involved are whether respondent erred:

(1) In disallowing petitioner's claimed deduction of $31,920.07 for the year 1942 as a bad debt which became worthless during that year;

(2) In failing to allow for the year 1943 a deduction for additional California franchise tax in the amount of $1,332.24, which is claimed by petitioner to have accrued in 1943 as a liability measured by petitioner's increased 1942 net income as determined by respondent, caused by his disallowance of the claimed bad debt deduction for 1942;

(3) In failing to allow for the year 1943 a deduction for petitioner's California franchise tax for 1944 in the amount of at least $1,032.21,

which is alleged to have accrued as a liability on December 31, 1943, based upon and measured by petitioner's net income for 1943;

(4) In failing to allow for the year 1943 a deduction in the amount of petitioner's alleged operating net loss carry-back from the year 1945, which in turn depends upon solution of the question of whether attorney fees in the amount of $5,000 constituted deductible accrued expense in 1945;

(5) In failing to correctly determine petitioner's excess profits tax credit for the year 1943 as related to its equity invested capital, (a) by decreasing petitioner's accumulated earnings and profits as of January 1, 1943, in the amount of proposed deficiencies in income and excess profits taxes for 1942, and (b) by failing to include the accrual of the postwar refund credit as an asset; and

(6) In failing to allow an additional excess profits tax credit for 1943 arising from the carry-back of the unused excess profits credit for the year 1945.

The proceeding has been submitted upon the pleadings, testimony, exhibits and a stipulation of facts, including exhibits attached thereto. The facts as stipulated are so found and included herein by reference. Only such facts as are deemed necessary to the disposition of this proceeding will be set forth herein.

## *First Issue.*

### FINDINGS OF FACT.

The petitioner is a California corporation, which was organized on August 28, 1939, and at all times material herein it maintained its principal place of business in Oakland, California. For the taxable years involved petitioner's income tax, declared value excess profits tax, and excess profits tax returns were duly filed with the collector of internal revenue for the first district of California, and the stipulation herein sets forth for each year the amounts of taxes and the dates on which paid. The petition herein was filed on February 24, 1947.

From the date of its organization to and including the years 1942 and 1943 petitioner was engaged in the business of buying and selling lumber and manufacturing, fabricating, and selling cross arms, wooden tanks, wooden pipes, and other wooden products. At all times herein material the petitioner kept its books of account and prepared its income tax returns on the accrual basis of accounting.

George W. Gorman was the sole stockholder, the president, and a director of petitioner from the time of its incorporation in 1939 until his death on January 31, 1942. From prior to 1939 to the date of his death, George W. Gorman was also engaged in buying, shipping, and selling lumber under the name of Gorman Lumber Co., a sole proprietorship.

During the period from its incorporation on August 28, 1939, to January 31, 1942, petitioner purchased lumber from, sold products to, and engaged in other business transactions with George W. Gorman, doing business as Gorman Lumber Co. During that period the petitioner maintained on its books an open account in which were entered the debits and credits resulting only from ordinary business transactions between those parties, and no personal advances from petitioner to George W. Gorman were entered in that account. The balance in the account fluctuated from time to time, both as to the amount and as to who was the debtor or creditor, and the balance due petitioner from George W. Gorman on the date of his death was in the amount of $27,153.32. After Gorman's death and during the period from March 31 to May 30, 1942, inclusive, petitioner made advances to pay certain business obligations of George W. Gorman, deceased, in the total amount of $3,266.75, which included the sum of $986.22 interest due the Capital National Bank of Sacramento (hereinafter sometimes referred to as the bank) on its loan to decedent and the sum of $2,280.53 due the Trans-Pacific Lumber Co., arising from a sale of lumber, that company's claim therefor being thereupon assigned to petitioner. The amount of $3,266.75 was debited to the above mentioned open account, so that on May 30, 1942, the balance in the account due petitioner amounted to $30,420.07. In addition to the amount due on the open account at the date of death, George W. Gorman owed petitioner $2,500 representing the balance due on petitioner's loan of $5,000 to him personally in March 1941, which was entered in a "Sundry Receivables" account on petitioner's books.

George W. Gorman, who was a very robust man, had been very actively engaged in his business until two or three weeks before his death and had appeared to be in good health until a month prior to his death at 48 years of age. Gorman's individual ability and contacts had been a principal factor in the success of petitioner's business and that of the Gorman Lumber Co., and the petitioner's directors expected his accounts to be paid in due course.

On August 22, 1941, George W. Gorman borrowed from the bank the respective sums of $17,500 and $65,000 and gave his promissory notes therefor. As security for the notes he assigned to the bank an account in the sum of $5,000 due him from the Gorman Steamship Co. and also assigned to the bank 5,984 shares of capital stock of petitioner. On or about December 27, 1941, and as further security for the notes, Gorman endorsed to the bank a promissory note in the sum of $24,000, payable to him by petitioner for salary for the year 1941.

In August 1941, shortly after Gorman obtained the above mentioned loans from the bank, Walter Funk, an officer of the bank, and Harry Straine, a certified public accountant who performed services for the

bank, were both elected as directors of petitioner because Gorman's indebtedness to the bank had reached the point where it required close supervision by the bank in order to protect its interest; and thereafter Funk regularly attended meetings of petitioner's board of directors, consisting of himself, Gorman, and Straine, and kept in close touch with the business and financial affairs of the company.

The last will and testament of George W. Gorman, deceased, was duly admitted to probate by the Superior Court of the State of California in and for the County of Alameda, and his widow, Marion Ide Gorman, was appointed executrix of his estate. On August 19, 1942, there were filed with the probate court the executrix's sworn inventory and appraisal and the court-appointed inheritance tax appraiser's sworn appraisal made on April 17, 1942, of the assets of the decedent's estate, showing a total appraised valuation of $73,250. That valuation was composed of the following items:

| Property | Appraised Value |
|---|---|
| (1) Certificate No. 1 for 125 shares of the capital stock of Port Oxford Lumber Co. | $11,250 |
| (2) Certificate No. 2 for 1,000 shares, and certificate No. 4 for 4,984 shares of the capital stock of Gorman Lumber Sales Co. | 35,000 |
| (3) Promissory note of Gorman Lumber Sales Co. | 24,000 |
| (4) Accounts receivable, aggregating $7,307.20 | 1,250 |
| (5) Account—salary due from Gorman Steamship Co., $5,000 | Nil |
| (6) 1939 Chevrolet sport sedan | 500 |
| (7) Office furniture | 500 |
| (8) 1937 Chevrolet lumber truck | 750 |
| Total | 73,250 |

After Gorman's death the certificate for 125 shares of Port Oxford Lumber Co., appraised at $11,250, and at the time pledged as collateral for a $5,000 loan to Gorman, was sold by the holder on July 3, 1942, for $7,000, and, after application of part of the proceeds of the sale to payment of the loan and interest thereon, the estate of Gorman received $1,875. After Gorman's death the bank, as pledgee, collected the note of the Gorman Lumber Sales Co. for $24,000 in full and collected $4,500 on the account of $5,000 due from the Gorman Steamship Co. and applied those amounts on the bank's $82,500 loan to Gorman, thereby leaving the balance of Gorman's debt to the bank in the amount of $54,000, secured by 5,984 shares of capital stock of petitioner, which stock had a fair market value not in excess of $54,000 throughout the year 1942. On August 31, 1942, the probate court entered an order, as hereinafter set out, approving an agreement whereby the decedent's estate settled the bank's $54,000 claim by transferring title to the 5,984 shares of petitioner's stock to the bank and settled petitioner's $32,920,07 claim by payment of $1,000 in cash. At that time the above

listed inventoried items had been reduced to the office furniture, appraised at $500; the 1937 Chevrolet lumber truck, appraised at $750 (both of which were subsequently sold on September 14, 1942, for a total of only $650); the accounts receivable, appraised at $1,250; the 1939 Chevrolet sport sedan, appraised at $500; and the $1,875 cash received from the sale of the Port Oxford Lumber Co. stock; or a remaining total asset value of not in excess of $4,875, not including the 5,984 shares of petitioner's stock, as to which the bank as pledgee had prior claim in so far as those shares secured the payment of the $54,000 indebtedness.

As against the remaining assets of decedent's estate as of August 31, 1942, having an appraised value of $4,875, as above stated, there existed the following claims which had priority over petitioner's $32,920.07 claim: Expenses of last illness and funeral, $1,823.34; administration expenses, including attorney fees, $2,650, approved by the court; and the widow's support and maintenance at the rate.of $250 per month, as ordered by the probate court from January 31, 1942, until further notice and ultimately amounting to approximately $3,750; making a total of $8,223.34 claims having priority against the assets of decedent's estate. The decedent's estate was insolvent and, exclusive of the petitioner's $32,920.07 claim, the amount of claims having priority was greater than the above mentioned remaining assets.

After the death of Gorman, his widow's father, W. G. Ide, was elected president and a director of petitioner, and he served in that capacity until August 1942. At the same time Herbert A. Tildesley, who had theretofore been assisting Gorman in the management of petitioner, was appointed general manager of petitioner, to take the decedent's place in the general management and direction of petitioner's business, and he served in that capacity until August 1942, when he and Clinton H. Guldager after having agreed to purchase the 5,984 shares of stock of petitioner from the bank, as hereinafter stated, were elected president and vice president, respectively, and also directors of petitioner.

After Gorman's death there developed various difficulties, including friction and discord among the employees, and also, due to the decedent's prior disputes with lessor, the definite possibility that petitioner's lease would not be renewed when it expired on December 1, 1942. In the latter event, petitioner's business was in danger of termination, because the lease embraced the plant and machinery with which petitioner operated and also petitioner's use of the established and valuable trade name of Pacific Tank & Pipe Co., and it would have been impossible for petitioner to have obtained a lease carrying similar advantages. After Gorman's death Walter Funk continued to serve as a director of petitioner and on behalf of the

bank he made several efforts to induce various persons, including the decedent's widow, to assume the decedent's $54,000 debt to the bank and take over the pledged shares of petitioner's stock, but without success, until the arrangement was made as provided in the agreement of August 11, 1942, hereinafter set out.

The bank's claim for $54,000 and the petitioner's claim for $32,920.07 were presented to the executrix of the estate of George W. Gorman, deceased, on August 13, 1942, and August 14, 1942, respectively, and both claims were filed with the probate court on August 31, 1942.

On August 11, 1942, Marion Ide Gorman, individually, and as executrix of the estate of George W. Gorman, deceased, as the first party, and the Capital National Bank of Sacramento, as the second party, entered into a written agreement which set forth, *inter alia*, that the decedent and his estate owed the bank $54,000 on the unpaid balance of his promissory note, with interest thereon from May 22, 1942, secured by 5,984 shares of stock of the petitioner; that the Gorman Lumber Sales Co. (petitioner herein) had a claim against the decedent's estate for indebtedness in the sum of $32,920.07; that the decedent's estate and the first party were without funds to pay the promissory note held by the bank to exonerate the pledged shares of stock or to pay the indebtedness due the Gorman Lumber Sales Co., and further set forth that the parties agreed, subject to the approval of the probate court, that the bank would secure the consent of the Gorman Lumber Sales Co. to accept $1,000 cash in full settlement of all indebtedness held by it against the decedent's estate; that the bank would cancel and surrender the decedent's promissory note and release the decedent's estate from all obligations to the bank upon the latter's receipt of an unconditional assignment and transfer of all the pledged shares of stock by the first party, as executrix, to the bank and also upon the bank's receipt of the sum of $7,000 paid by the first party, individually, to the bank, to be held by the latter as collateral security for the payment of a $54,000 promissory note to be executed in favor of the bank of Clinton H. Guldager and Herbert A. Tildesley, as evidencing the purchase price those individuals were to pay the bank upon its resale of the shares of stock to them; and that upon payment of the Guldager-Tildesley note the $7,000 deposited as collateral by the first party, individually, would be returned to her, without interest. That agreement was consented to and approved by the Gorman Lumber Sales Co. by H. A. Tildesley and C. H. Guldager, as president and vice president, respectively, and as authorized by a resolution of the company's board of directors because of the insolvency of the decedent's estate, and the agreement was also consented to and approved by Tildesley and Guldager, individually. On August 19, 1942, the executrix of decedent's estate filed in the probate court a petition for an

order authorizing the compromise of claims as set out in the above mentioned agreement. On August 31, 1942, the probate court entered an order wherein it found, *inter alia*, that the decedent's "estate is without assets with which to pay the indebtedness due said bank and to pay the indebtedness due said Gorman Lumber Sales Company" and that it was to the best interests of the estate and all persons interested therein that the claims be compromised on the terms set forth in the agreement of August 11, 1942, and it ordered that the executrix's "execution of said agreement be and it hereby is confirmed and approved," and she was authorized and directed to carry out the terms of the agreement, as executrix.

On October 13, 1942, pursuant to the above mentioned agreement and court order, the executrix of decedent's estate transferred 5,984 shares of petitioner's stock to the bank in full satisfaction of its claim for $54,000 against the estate and she paid $1,000 to petitioner in full settlement and satisfaction of its claim for $32,920.07 against the decedent and his estate. The agreement as to the bank's sale of the shares of stock to Guldager and Tildesley, as individuals, was carried out and the agreed purchase price of $54,000 was fully paid by May 26, 1943. On June 2, 1943, the probate court entered a decree approving the final report of the executrix of the estate of George W. Gorman, deceased, and ordering a distribution of the estate, consisting of the 1939 Chevrolet sedan which had been appraised at $500 and some accounts receivable which had been appraised at $1,250, to the surviving widow.

On October 13, 1942, the petitioner herein credited its open account with George W. Gorman, deceased, with the $1,000 payment received from the executrix of his estate, and on October 30, 1942, petitioner charged off the balance of $29,420.07 of that account as a worthless debt. On October 31, 1942, petitioner charged off on its books as a worthless debt the remaining balance of $2,500 loaned to the decedent in 1941 and carried in the "Sundry Receivables" account on its books.

On its tax return for 1942 petitioner claimed a deduction in the amount of $31,920.07 as a debt which became worthless in 1942, and in determining the deficiencies involved herein respondent disallowed such claimed deduction for the stated reason that "It is held that you are not entitled to deduct as a bad debt or a loss an indebtedness accrued by withdrawals of your sole stockholder who was insolvent."

OPINION.

This first issue presents a question of fact.

Petitioner contends that the facts clearly establish that the indebtedness of George W. Gorman, deceased, and of his estate to the peti-

tioner was a bona fide one growing out of purely business transactions; that the debt became worthless to the extent of $31,920.07 thereof in August 1942, due to the then insolvency of the decedent's estate and the estate's payment of $1,000 in full settlement of the debt; and that therefore petitioner is entitled to the claimed deduction for the year 1942 under section 23 (k) of the Internal Revenue Code, which provides that in computing net income there shall be allowed as a deduction, "Debts which become worthless within the taxable year   *   *   *."

At the hearing respondent stated that this issue does not involve any question as to fair market value of the shares of stock of petitioner in 1942, because there was a sale thereof for $54,000 approved by the probate court. The respondent does not question the amount of the debt involved, but contends that it is not an allowable deduction because it did not become worthless during 1942, and, if we understand the respondent's position correctly, for the reason that the August 11, 1942, agreement was a three-cornered arrangement whereby, in substance, the bank secured the cancellation of the estate's $31,920.07 debt to petitioner in consideration for the estate's transfer of its equity in the stock to the bank, and the petitioner's cancellation of the $31,920.07 debt was in substance, although not in form, the equivalent of a dividend to its sole stockholder, the bank, or, if not a dividend to the bank, then, in the alternative, a dividend to the decedent's estate.

The bank was not a stockholder of petitioner prior to the cancellation of $31,920.07 of the decedent's debt to petitioner, and the bank's only interest in the transaction under the August 11, 1942, agreement was the recovery of the $54,000 owed to it by the decedent's estate, and that amount was ultimately recovered through the resale of the shares of stock of petitioner to two individuals, Tildesley and Guldager, for $54,000.   It it clear that as a matter of fact the bank did not receive a dividend payment from petitioner.

Furthermore, in our opinion, this record does not support a finding that the petitioner, in charging off $31,920.07 as a worthless debt of the decedent's estate, thereby distributed a dividend to the estate. Cf. *Jas. J. Gravley*, 44 B. T. A. 722, and *Hugh H. Miller*, 25 B. T. A. 418, cited by respondent.   Those two cases are distinguished from and therefore not applicable to the case at bar.   In each of those cited cases the circumstances surrounding the withdrawals by the principal stockholder and the corporation's subsequent cancellation of the debt while the stockholder was solvent, or not shown to have been insolvent, were such as to support a conclusion of fact that the corporation made a distribution of a dividend taxable to the stockholder, who was the taxpayer involved.   Here, the decedent's debt, constituting a claim against his estate, arose from business transactions and not mere

withdrawals of corporate earnings for the decedent's personal use, and, further, the decedent's estate was insolvent and the debt was uncollectible at the time the claim therefor was compromised by petitioner's acceptance of $1,000 in full settlement thereof pursuant to the order of the probate court with which petitioner had filed its claim for $32,920.07 against the estate.

In our opinion this is not a case which calls for application of the rule, substance versus form, as urged by respondent, for here the substance is not *contra* to the form of the transaction involved. The facts clearly show that the decedent's estate was indebted to petitioner in the amount of $32,920.07, growing out of bona fide business transactions; that in the course of the administration of the estate it became evident that the estate was insolvent and had insufficient assets to pay claims having priority over the petitioner's claim; and that the petitioner received and accepted $1,000 in cash in full settlement of such debt and wrote off the balance which became worthless during the taxable year 1942.

We conclude and hold that the debt in question due petitioner in the amount of $31,920.07 became worthless during 1942 and constituted an allowable deduction for that year under section 23 (k), *supra*. With respect to this issue, we hold that respondent erred.

## Second Issue.

### FINDINGS OF FACT AND OPINION.

For the year 1943 petitioner duly filed its California corporation franchise tax return, in which its franchise tax was based upon and measured by petitioner's 1942 net income, in the computation of which the above mentioned claimed bad debt of $31,920.07 was deducted.

This second issue raises the question of whether, in determining petitioner's Federal excess profits tax liability for the year 1943, respondent erred in failing to allow a deduction for additional California franchise tax of 1943 in an amount based upon an addition to petitioner's 1942 net income which would result from the disallowance of the claimed bad debt deduction for 1942 involved in the first issue herein. In view of our decision on the first issue, that the claimed $31,920.07 bad debt was an allowable deduction for 1942, there would be no addition to petitioner's net income for that year as determined by respondent and no additional California franchise tax for 1943. Therefore, this second issue, which must be considered as alternative in relation to the first issue, has become a moot question, which requires no expression of opinion as to whether or not any such additional franchise tax, if incurred, would constitute a definitely fixed and accrued liability for the taxable year 1943.

## *Third Issue.*

### FINDINGS OF FACT AND OPINION.

For the year 1944 petitioner duly filed its California corporation franchise tax return, in which its franchise tax was based upon and measured by petitioner's 1943 net income. The return disclosed a 1944 franchise tax of $1,016.99, which was paid during 1944. Such franchise tax was claimed as a deduction by petitioner on its 1944 Federal income tax return and was neither claimed by petitioner nor allowed by respondent as a deduction in computing petitioner's 1943 Federal income tax liability; but petitioner now claims it as a deduction for 1943.

This third issue raises the question of whether, in determining petitioner's Federal excess profits tax liability for the year 1943, respondent erred in failing to allow a deduction for the franchise tax paid in 1944 and measured by its 1943 net income. Petitioner contends that under the California Bank and Corporation Franchise Tax Act, as amended in 1943, its 1944 franchise tax became a fixed and accrued liability on December 31, 1943, and, therefore, deductible for the taxable year 1943. This issue was decided adversely to petitioner in *Central Investment Corporation*, 9 T. C. 128; affirmed per curiam, 167 Fed. (2d) 1000; certiorari denied October 11, 1948; wherein it was held that the California franchise tax imposed for the privilege of doing business during 1944, based upon and measured by 1943 income, accrued and became deductible for Federal tax purposes in 1944 rather than in 1943. On this issue we hold that respondent did not err in his determination.

## *Fourth Issue.*

### FINDINGS OF FACT.

Petitioner duly filed its corporation income and declared value excess profits tax return for the calendar year 1945, on which it reported a net operating loss of $7,220.79. The parties are agreed that petitioner had gross income in the amount of $2,229.98 and was entitled to certain deductions totaling $2,695.77 for the year 1945. In addition to the agreed deductions petitioner claimed a deduction of $5,000 as an expense for legal fees.

From about March 1942 to and including 1945, George Koster rendered services as attorney for petitioner in advising it on business matters generally, tax matters, and legal matters. During that period he followed the practice of rendering in December of each year a statement for the total fee due for legal services rendered in that year. On December 22, 1945, Koster rendered petitioner a statement for a fee of

$5,000 for all legal services performed by him during the calendar year 1945. At that time the $5,000 was entered on petitioner's books as an accrued expense.

OPINION.

As presented by the parties, this fourth issue is limited to a question of fact of whether the $5,000 legal fee constituted an accrued expense and therefore was deductible in computing the correct amount of petitioner's 1945 net operating loss for the purpose of determining the deduction allowed, under sections 23 (s) and 122, Internal Revenue Code, for the year 1943 as a net operating loss carry-back from the year 1945.

The respondent's position is that the $5,000 legal fee is allowable as a deduction for the year when petitioner's liability therefor accrued, but contends that it did not accrue in 1945, for the reason that the conclusions to be drawn from the evidence herein are that the services for which it was intended to be paid were not fully rendered during 1945 and that it was intended as compensation for legal services in representing petitioner in this proceeding.

The testimony herein is unequivocal that Koster's statement rendered on December 22, 1945, embraced a fee of $5,000 solely for legal services fully performed by him during the year 1945 and not for any contemplated future services. It is clear that legal services in this proceeding were not contemplated in December 1945, for the deficiency notice from which this proceeding was initiated is dated December 11, 1946.

On the record, we conclude that the $5,000 legal fee accrued as a liability of petitioner in 1945 and constituted a deductible expense in computing the amount of petitioner's net operating loss for the year 1945. The petitioner was in process of liquidation during 1944 and 1945, but in *Acampo Winery & Distilleries, Inc.*, 7 T. C. 629, 639, it was held that the net operating loss carry-back deduction provided for by sections 23 (s) and 122, *supra*, is not denied to corporations because they are in process of liquidation and dissolution.

On this issue, we hold that respondent erred, and effect to this opinion will be given in the recomputation under Rule 50.

*Fifth Issue.*

FINDINGS OF FACT AND OPINION.

This issues involves the question of whether respondent erred in his computation of petitioner's excess profits credit for the year 1943 based upon his determination of the amount of petitioner's equity invested capital at January 1, 1943, wherein, *inter alia*, (a) he decreased petitioner's accumulated earings and profits as of January 1,

1943, by the amount of $33,244.54 as "1942 income and excess profits tax as adjusted," which includes the proposed and controverted deficiency for that year treated of in the first issue, and (b) he failed to include the accrual of the postwar refund credit as an asset.

The decision herein on the first issue, that respondent erred in denying a claimed bad debt deduction of $31,920.07 for the year 1942, will eliminate that portion of the asserted income and excess profits tax deficiencies for 1942 which has been contested by petitioner, because in view of that decision such portion obviously could not have accrued in 1942. To this extent there will necessarily be required a modification of respondent's determination with respect to the amount of petitioner's equity invested capital at January 1, 1943, which he decreased by the amount of the 1942 deficiencies as an accrued liability.

With respect to any remaining income and excess profits tax deficiencies for 1942 shown to be due under the Rule 50 recomputation pursuant to this opinion, we hold that those deficiencies, if any, properly serve to decrease petitioner's accumulated earnings and profits as of January 1, 1943, as an accrued liability, for to the extent thereof such liability was not heretofore and is not in this proceeding contested by petitioner and thus constitutes a proper accrual. Cf. *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516. For the purpose of computing the excess profits credit for 1943, petitioner contends that its accumulated earnings and profits as of January 1, 1943, should include the accrual of the postwar refund credit as an asset. In *Altschul's, Inc.*, 9 T. C. 697, it was held that, for the purpose of computing a corporate taxpayer's excess profits credit for the taxable year involved, in the computation of accumulated earnings and profits relating to the amount of equity invested capital the postwar refund credit provided by section 780 of the code was a proper accrual as an asset, for the reason that the amount of the credit is percentaged on the amount of the tax and is subject to upward and downward revision in the event of revision of the tax liability upon which it is based and that whenever the tax is accruable the credit is also properly accruable. On authority of that case, we hold that petitioner's accumulated earnings and profits as of January 1, 1943, should include the accrual of the postwar refund as an asset, and further hold that on this issue the respondent erred as indicated above. Effect to our holding under this issue will be given in the recomputation under Rule 50.

### *Sixth Issue.*

#### FINDINGS OF FACT AND OPINION.

This issue involves the question of whether for the year 1943 petitioner is entitled to a carry-back of the unused excess profits credit

for the year 1945. The facts herein disclose that in August 1944 liquidation and dissolution of petitioner was voted by its stockholders; petitioner distributed practically all of its assets; petitioner was not thereafter engaged in the business of buying and selling lumber or manufacturing and selling wooden products; a trustee in liquidation was appointed to receive the remaining assets, to pay petitioner's remaining debts, to collect any outstanding accounts receivable, to settle its affairs, and to adjust among the three stockholders any inequalities in their respective interests occasioned by the distribution. Petitioner, as a going corporation, was engaged in necessary and orderly liquidation not beyond the taxable year 1944, and when it entered the next succeeding taxable year, 1945, only the corporate shell was left, with continued existence for the mere purpose of enabling the trustee in liquidation to settle up its affairs; and, accordingly, for the purpose of petitioner's claim for excess profits carry-back credit from 1945 under section 710 (c) (3) (A) of the code, petitioner must be regarded as *de facto* dissolved prior to 1945 and not entitled to the claimed credit. *Wier Long Leaf Lumber Co.*, 9 T. C. 990; modified as to one year in *Wier Long Leaf Lumber Co.* v. *Commissioner*, 173 Fed. (2d) 549; and *Rite-Way Products, Inc.*, 12 T. C. 475.

The principle announced in the *Acampo Winery* case, *supra*, and applied in the fourth issue herein, that a net *operating loss* carry-back deduction is not to be denied under section 23 (s) and 122 of the code to corporations in process of liquidation and dissolution, is not apposite to this issue, since it is effectively distinguishable here for the same reasons as it was distinguished in this Court's opinion in the *Wier* case, *supra*. It is unnecessary to here repeat those reasons.

On the sixth issue we hold that respondent did not err.

Reviewed by the Court.

*Decision will be entered under Rule 50.*