**A B C BREWING CORPORATION** (formerly Aztec Brewing Co.), a corporation, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 14412.

United States Court of Appeals
Ninth Circuit.

June 22, 1955.

Todd W. Johnson and Edward D. Robertson, Los Angeles, Cal., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Caroly R. Just and David O. Walter, Sp. Assts. to Atty. Gen., for respondent.

Before STEPHENS and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

The facts involved in this petition to review a decision of the Tax Court of the United States, as they may be gathered from the stipulated facts and facts found by the Tax Court, 20 T.C. 515, which cannot be successfully disputed, are these:

A B C Brewing Corporation, formerly known as the Aztec Brewing Company, the petitioner (to be referred to hereafter as "taxpayer") is a California corporation with its principal place of business located at San Diego, California. Its return for the taxable years involved, filed with the Collector of Internal Revenue for the Sixth District of California,

were prepared on an accrual basis for a fiscal year ending October 31. Taxpayer was organized under the laws of California in 1932 under the name of Aztec Brewing Company, which name was changed to A B C Brewing Corporation on September 21, 1946.

Taxpayer operated a brewery at San Diego, California, from June, 1933, to March 31, 1944. Its stockholders agreed to its dissolution on March 7, 1944, and on April 1, 1944, there was a distribution to the stockholders and partial liquidation of $750,000.00 book value of assets. Taxpayer *has not actively engaged* in the brewery business since March 31, 1944. Petitioner's balance sheets showed the following assets and liabilities on March 31, 1944:

Total assets—$1,540,321.67; Total liabilities,—$1,540,321.67. The items which went to make up these items are not important. However, it is well to note that the corporation listed as cash on hand $11,476.72, and cash deposited in the Bank of America, $554,791.02, or a total of $566,267.74. The inventory cost of finished stock and containers, beer in storage, raw material and supplies totaled $363,411.05. The plant and equipment were listed, after deducting reserve for depreciation, at $386,460.42. As of October 31, 1944, the assets had been reduced to: Cash $107,158.61, United States Treasury obligations, $143,172.23, or a total of $250,330.84. The liabilities as of October 31, 1944, consisted chiefly of accrued taxes, accrued expenses, unrealized profit on excess profits tax bonds, and earned surplus, which, after various deductions, reduced the liabilities to $250,330.84. The details do not concern us in this review. The balance sheets as of October 31, for the years 1945 and 1946 were:

| Assets | 1945 | 1946 |
|---|---|---|
| Cash | $ 1,498.11 | $15,299.58 |
| U.S. Treasury Obligations | 13,172.23 | 10,000.00 |
| Total Assets | 14,670.32 | 25,299.58 |

The increase in the net worth over the period October 31, 1945, to October 31, 1946, was $13,733.44. Additional details will be given during the course of the discussion to follow.

Petitioner's returns for the years 1945 and 1946 showed the following items of gross income and deductions:

Fiscal Year Ended October 31,

| Gross Income | 1945 | 1946 |
|---|---|---|
| Interest on U.S. Obligations | $ 582.00 | |
| Recoveries on bad debts | 256.00 | $150.00 |
| Refund on Calif. franchise tax | | 204.12 |
| Total income | 838.00 | 354.12 |
| Deductions | | |
| Capital stock tax | 62.50 | |
| California franchise tax | 12,621.34 | 21.25 |
| Collection fee on debt recoveries | 30.00 | |
| Total deductions | 12,713.84 | 21.25 |
| Net income or (loss) | $(11,875.84) | $332.87 |

Taxpayer maintained a bank account throughout 1944, 1945 and 1946, during which years its president and auditor performed certain services on its behalf, such as preparation and filing of federal and state tax returns, petitions to the Tax Court, applications for relief under Section 722, 26 U.S.C.A. § 722, and taking care of other matters relating to the winding up of the taxpayer's affairs. Some collections were made in 1944 and 1945 of small amounts on accounts which taxpayer had previously charged off, and certain small expenses were incurred.

On January 4, 1946, taxpayer's auditor received a letter from its attorney, which, among other things, stated:

"It is also believed advisable to file a corporation excess profits tax return for the year ended October 31,

1945, even though no tax is due for that year in order to show a basis for claiming the benefits of an unused excess profits credit carry-back. That return has been prepared and is enclosed herewith in triplicate."

No dissolution certificate has ever been filed on taxpayer's behalf with the Secretary of State of California, as required by Section 5200 of the California Corporations Code.

Taxpayer filed corporation income tax and excess profits tax returns for the years 1943, 1944, 1945 and 1946 with the Collector of Internal Revenue for the Sixth District of California. On September 18, 1944, and April 20, 1946, the Collector of Internal Revenue mailed a notice of deficiency to the taxpayer advising it of a deficiency in excess profits taxes of $232,437.25 for the fiscal year 1943, and $41,557.63 for the fiscal year 1944. Timely petitions for redetermination of deficiencies under Section 275 of the Internal Revenue Code, 26 U.S.C.A. § 275, were filed with the Tax Court. On March 16, 1954, the Tax Court entered its decision finding deficiencies in excess profits taxes for the years 1943 and 1944 in the amounts of $217,423.07 and $36,738.21, respectively.

Before us is a petition to review the decision of the Tax Court, Internal Revenue Code, 1954, 26 U.S.C., § 7482, in which we are to determine the correctness of the finding of the Tax Court disallowing the taxpayer's claim for a carry-back of the alleged unused excess profits credit from the fiscal years 1945 and 1946 to the year 1944.

The problem involved arises under the provisions of Section 710(a) of the Internal Revenue Code of 1939 as added by Section 201, Second Revenue Act of 1940, c. 757, 54 Stat. 974, which imposes a 95 per centum tax on the "adjusted excess profits net income". 26 U.S.C., 1952 ed., § 710(a) (1) (A).

The term "adjusted excess profits net income" is defined to mean the excess-profits net income as defined in Section 711, from which is deducted a certain specific exemption, Section 710(b) (1), an excess profits credit under Section 712, Sec. 710(b) (2), and "the amount of the unused excess profits credit adjustment for the taxable year computed in accordance with subsection (c)". Sec. 710(b) (3).

The unused excess-profits credit adjustment for a taxable year consists of "the aggregate of the unused excess profits credit carry-overs and unused excess profits credit carry-backs to such taxable year". Sec. 710(c) (1), 26 U.S.C., § 710, 1952 ed.

Section 713 of the same Act made the excess-profits tax credit "95 per centum of the average base period net income". Sec. 713(a) (1) (A).

In the case before us, the Tax Court allowed carry-backs for the entire taxable year 1944, but disallowed the taxpayer's claim for a carry-back of alleged unused excess-profits credit from the fiscal years 1945 and 1946 to the year 1944. The authority for such carry-back is contained in Section 710(c) (3) (A), which, excluding certain exceptions which do not concern us here, reads:

"(A) Unused excess profits credit carry-back. If for any taxable year beginning after December 31, 1941, the taxpayer has an unused excess profits credit, such unused excess profits credit shall be an unused excess profits credit carry-back for each of the two preceding taxable years." 26 U.S.C., 1952 ed., § 710 (c) (3) (A).

◼◼◼ The object of the excess-profits tax and of the provisions allowing carry-backs for the years prior to 1945 when the excess-profits tax was repealed, has been stated very well by the Court of Claims in a unanimous decision:

"The purpose of the excess profits tax law was, of course, to absorb by taxation most of any abnormal profits which the stimulation of business by the war might bring to corporations. Excess profits were those in

excess of the average profits of certain prewar years, and in excess of a specified return on invested capital. But, in order to prevent the undue hardship which might result from taking by taxation practically all abnormal profits while maintenance and upkeep expenses were having to be deferred because of shortages and wartime restrictions, leaving plants run down and no reserves to restore them, Congress in 1942 enacted section 710(c) (3) (A) of the Internal Revenue Code, 26 U.S.C.A., § 710(c) (3) (A), providing for the carry-back of any unused excess profits tax credit to cancel out excess profits taxes incurred for the two preceding years. This meant, as we understand it, that if a corporation having had excess profits in a given year, in a later year had less than normal profits, measured by the prewar standard formula, it could carry this deficiency in profits back to balance its excess profits for one or both of the two preceding years. When, in 1945, Congress repealed the excess profits tax law, it thought that it was fair to continue, for the year 1946, the averaging out process embodied in the carry-back provision, so it left that provision in effect for the year 1946." Aluminum Products Co. v. United States, 101 F.Supp. 373, 375, 121 Ct.Cl. 187.

■ The Tax Court and Courts of Appeals which have interpreted the excess-profits tax and the carry-back provisions, have expressed the view that the Congress has spelled out in unambiguous terms the purpose of the Act, and that this being so,

"It was not permissible to go behind the words of the statute and restrict its meaning to some narrower purpose than its words expressed." Aluminum Products Co. v. United States, supra, at page 375.

When its meaning is clear, the courts will not read limitations, restrictions or qualifications into a tax statute. See, Wier Long Leaf Lumber Co. v. C. I. R., 5 Cir., 1949, 173 F.2d 549, 551; Mesaba-Cliffs Mining Co. v. C. I. R., 6 Cir., 1949, 174 F.2d 857, 860–861; Ken-Rad Tube & Lamp Corp. v. C. I. R., 6 Cir., 1950, 180 F.2d 940, 942; Commissioner of Internal Revenue v. Ambrose, 2 Cir., 1953, 204 F.2d 796, 797. This being so, the question before us is: Was the Order of the Tax Court disallowing the carry-back "clearly erroneous"? 26 U.S.C., § 1141 (a), now Section 7482; Rule 52(a), Federal Rules of Civil Procedure, 28 U.S. C.A. And see, National Brass Works, Inc., v. C. I. R., 9 Cir., 1953, 205 F.2d 104, 106; Stockton Harbor Industrial Co. v. C. I. R., 9 Cir., 1954, 216 F.2d 638, 640.

■ The determination of this problem turns upon the proper application of the law to the Findings of the Court and the undisputed facts already set forth as to the status of the corporation. In effect, the Tax Court found that the taxpayer, upon a voluntary dissolution under California law, agreed to by the stockholders on March 7, 1944, there was a transfer to the stockholders on April 1, 1944, of $750,000.00 book value of assets, and that since March 31, 1944, the corporation *has not* engaged in the brewery business. The proceeding for voluntary dissolution without court intervention conformed to the law of California as it then stood. California Civil Code, 1935 ed., §§ 400a, 401, 401a, 401c, 402, 403b. The proper resolution was adopted, but the certificate required to be filed with the Secretary of State certifying the complete winding up of the corporation was never filed. California Civil Code, § 403c. Under the law as it then read, the notice to wind up "is a notice of intended cessation of business but is not a dissolution of the legal entity of the corporation". Bank of Alameda County v. McColgan, 1945, 69 Cal. App.2d 464, 472, 159 P.2d 31, 35. Only the certificate that the corporation " 'has been completely wound up' " is "a formal end of corporate existence". Bank of Alameda County v. McColgan, supra, 69

Cal.App.2d at page 472, 159 P.2d 31, at page 35. When the winding up has been completed by this process, the corporation "ceases to exist". Stubbs v. Jones, 1953, 121 Cal.App.2d 218, 223, 263 P.2d 100, 103.

The law as it then stood provided that

"Before any corporation taxed under the Bank and Corporation Franchise Tax Act *may* file a certificate of dissolution it *must* file or cause to be filed with the Secretary of State the certificate of the Franchise Tax Commissioner provided for by Section 29 of said act." (Emphasis added.) Cal.Civil Code, 1943 ed., § 403c(1) (c); California Corporations Code, § 5201.

The certificate attests to the fact that all the taxes imposed under the Bank and Corporation Franchise Tax Act "have been paid or secured". No penalty is provided for failure to secure this "certificate of satisfaction", as a prerequisite to the filing of the certificate of dissolution. No official action by any state official *was (or is now) required* to precede or follow the filing of the certificate of dissolution, except a certification by the Secretary of State of a copy for filing in the office of the County Clerk in which the principal office of the corporation was located. And the issuance of such certified copy was made dependent not upon the compliance of the condition precedent, i. e., the filing of the certificate of satisfaction of taxes, but *upon the fact of filing of the certificate of dissolution* by the directors or trustees of the corporation. The procedure has not been changed materially since. The statute still requires a vote of the stockholders electing to wind up the business of the corporation, notice to that effect, and the filing of the formal certificate. California Corporations Code, §§ 4600–4603. Both under the law as it stood at the time and under the present California law, when a voluntary proceeding for winding up a corporation *has been begun*, it is made mandatory that

"* * * the corporation shall *cease to carry on business* except to the extent necessary for the beneficial winding up thereof." California Corporations Code, § 4605. (Emphasis added.)

And see, California Civil Code, 1935 ed., Sec. 400a(2).

Federal tax decisions and regulations treat the problem of corporate existence pragmatically rather than legalistically. They recognize the fact that

"* * * if it appears that the corporation is a corporation in name and semblance only, without corporate substance and serving no real corporate purpose, it must, *though not formally dissolved, be treated as dissolved defacto.*" (Emphasis added.) Wier Long Leaf Lumber Co. v. C. I. R., 5 Cir., 1949, 173 F.2d 549, 551.

And see, United States v. Kingman, 5 Cir., 1948, 170 F.2d 408; Wurtzbaugh v. C. I. R., 5 Cir., 1951, 187 F.2d 975, 976–977.

Treasury Regulations recognize that a corporation may have ceased to exist although, under state law, it may have continued existence for certain limited purposes connected with the winding up of its affairs:

"A corporation is not in existence after it ceases business and dissolves, retaining no assets, whether or not under State law it may thereafter be treated as continuing as a corporation for certain limited purposes connected with winding up its affairs, such as for the purpose of suing and being sued. If the corporation has valuable claims for which it will bring suit during this period, it has retained assets, and it continues in existence." (Regulation 111, 29.52–1, 26 Code of Federal Regulations, 1949 ed., p. 328.)

Under California law, a corporation which has been dissolved in accordance with any of the prescribed methods,

*including the voluntary dissolution method followed here,*

"* * * nevertheless continues to exist for the purpose of winding up its affairs, prosecuting and defending actions by or against it, and enabling it to collect and discharge obligations, dispose of and convey its property, and collect and divide its assets, but not for the purpose of continuing business except so far as necessary for the winding up thereof." California Corporations Code, § 5400.

Unlike the common law, American corporation law recognizes, as does the law of California, the continuance of a corporation for the purpose of litigating its actions after dissolution, despite its apparent legal death. See, United States v. Safeway Stores, 10 Cir., 1944, 140 F. 2d 834, 836–837; Defense Supplies Corporation v. Lawrence Warehouse Co., 1949, 336 U.S. 631, 634–635, 69 S.Ct. 762, 93 L.Ed. 931.

Formal dissolution after liquidation is significant only if the law of the State makes it so. O'Sullivan Rubber Co. v. C. I. R., 2 Cir., 1941, 120 F.2d 845, 847; C. I. R. v. Allegheny Broadcasting Corp., 3 Cir., 1950, 179 F.2d 844, 846–848. By the same token the courts, in giving effect to the plain wording of the statute, do not deny the benefit of the carryback provisions to corporations in the process of liquidation. Rather do they consider in each case "the fact of liquidation and the particular circumstance and stages of it." Wier Long Leaf Lumber Co. v. C. I. R., supra, 173 F.2d at page 551.

■■ In determining the availability of the carry-back to a particular corporation existing in a particular year, the courts are pragmatic. They apply the same criterion applied generally in recognizing for tax purposes a corporate entity, whatever motive entered into its creation, when it is actual and has a distinct tax identity. Higgins v. Smith, 1940, 308 U.S. 473, 476–477, 60 S.Ct.

355, 84 L.Ed. 406; Moline Properties, Inc., v. C. I. R., 1943, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499; National Carbide Corp. v. C. I. R., 1949, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779; United States v. Cummins Distilleries Corp., 6 Cir., 1948, 166 F.2d 17, 20–21; Delaney v. Gardner, 1 Cir., 1953, 204 F.2d 855, 861. And where a corporation is actually in the process of liquidation, the determination of whether it is, for tax purposes, non-existent, although the legal requirements of liquidation under State law may not have been completed, depends upon the fact whether, during the particular business year, in addition to the affairs incidental to formal winding up, it engaged in any "unambiguous business venture[s]". Moline Properties, Inc., v. C. I. R., supra, 319 U.S. at page 440, 63 S.Ct. 1134. This test for determining whether, for tax purposes, a corporation is engaged in business activity has been applied by this and other courts under other provisions of the Internal Revenue Code. See, Willis v. C. I. R., 9 Cir., 1932, 58 F.2d 121, 123; Thrash Lease Trust v. C. I. R., 9 Cir., 1938, 99 F.2d 925, 928; Title Insurance & Trust Co. v. C. I. R., 9 Cir., 1938, 100 F.2d 482; Porter v. C. I. R., 9 Cir., 1942, 130 F.2d 276, 280. And see, Main-Hammond Land Trust v. C. I. R., 6 Cir., 1952, 200 F.2d 308, 312. This court, in one of the cases just cited, in determining what constituted doing business, laid down the following simple rule which accords with the standard referred to by the Supreme Court in Moline Properties, Inc., v. C. I. R., supra:

"What constitutes the doing of business? Flint v. Stone Tracy Co., 220 U.S. [107] at page 171, 31 S. Ct. 342, 55 L.Ed. 389, Ann.Cas.1912 B, 1312. *They went beyond transactions carried on for the single purpose of effecting a liquidation of assets;* and for that reason the collection of an income tax was authorized under the terms of the revenue act." Willis v. Commissioner of Internal Revenue, 9 Cir., 1932, **58** F.2d 121, 123. (Emphasis **added.**)

In that case, the taxpayer contended that a certain trust was merely a liquidating trust, the income from which was not taxable. The court adverted to the fact that the trust agreement gave the trustees the power to acquire, manage, improve and dispose of trust property and other properties to be acquired. Under it, in the taxable years, income was derived from collection of rents, from sale of certain parcels of real property and acquisition of others by exchange, and from building buildings. These efforts, especially the exchange of property and the erection of a new building in order to increase the income, were considered sufficient to show that, while the major part of the income of the trust was derived from rents and liquidation of two mortgages, the other activities conformed to "a business venture" pattern.

In the light of these principles, the problem before us is not difficult of solution. In addition to the presumption of sufficiency which attaches to the Findings of Fact of the Tax Court unless they are "clearly erroneous", 26 U.S.C., § 1141(a), now Sec. 7482; Rule 52(a), Federal Rules of Civil Procedure, there is the accepted doctrine that deductions should be construed narrowly because they are a matter of legislative grace:

"* * * an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduc-

tion is on the taxpayer." Interstate Transit Lines v. C. I. R., 1942, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607.[1]

If these tests are applied to the facts in the case before us, the conclusion is warranted that the Tax Court was justified in finding that the taxpayer had *ceased* to exist as a corporation on April 1, 1944.

Consistently, the courts have held that where the business which is the main activity of a corporation had been liquidated, the corporation could not carry back to a prior year the unused excess-profits credit of the year during which it was in liquidation. Wier Long Leaf Lumber Co. v. Commissioner, supra; Rite-Way Products, Inc., v. Commissioner, 1949, 12 T.C. 475, 481; Gorman Lumber Sales Co. v. Commissioner, 1949, 12 T.C. 1184, 1196; Winter & Co., Inc., v. Commissioner, 1949, 13 T.C. 108, 117–120; Wheeler Insulated Wire Co. v. Commissioner, 1954, 22 T.C. 380. So doing, the courts did not establish a rigid criterion to apply to every case. Each instance is governed by the nature of the business of the corporation, its diminution or curtailment during the taxable year involved, and the relation of the activities carried on as contrasted with those engaged in when the corporation was in full operation.[2]

In the case before us, the taxpayer carried on a brewery business,—manufacture and sale of beer. All its physi-

---

1. The soundness of this principle has been questioned: Note, 1943, 56 Harv.L.Rev. 1142. However, we must follow it, as the Supreme Court has shown no inclination to depart from it. To the contrary, in an opinion filed on May 23, 1955, United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 75 S.Ct. 733, 736, the Court reasserted the principle in this manner:

"We deal here with a deduction *which one obtains not as of right, but as of grace.* Deputy v. Du Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416. *The taxpayer has the burden to show that it is within the provision allowing the deduction.*" (Emphasis added.)

2. Here again the courts have a realistic approach. Thus, where, subsequent to expressed intention to liquidate or substantial disposition of assets, business activities are, *nevertheless*, carried on, the corporation will be treated as an existing entity for tax purposes. Whitney Mfg. Co. v. C. I. R., 1950, 14 T.C. 1217, 1220–1221; Roeser & Pendleton, Inc., v. C. I. R., 1950, 15 T.C. 966, 975–976; Union Bus Terminal, Inc., v. C. I. R., 1949, 12 T.C. 197, 199–200, affirmed *sub nom.:* Commissioner of Internal Revenue v. Union Bus Terminal, 5 Cir., 1950, 179 F. 2d 399. Compare, United States v. Lynch, 9 Cir., 1951, 192 F.2d 718, 721; Gensinger v. C. I. R., 9 Cir., 1953, 208

cal assets, including the manufacturing plant, were transferred prior to April 1, 1944, to a partnership which, thereafter, carried on the business of the corporation.[3]

Under California law, Cal.Civil Code, § 400a(1); Cal.Corp.Code, § 4605, all its normal business activities ceased with the adoption of the resolution by the stockholders. Its actions after April 1 conformed not only to the spirit, but also to the letter of the law.. The taxpayer made no sales, carried no inventories, retained no ownership of lands, plant or equipment. All its assets were distributed to stockholders, except small amounts of cash and United States Treasury obligations. No salaries or wages were paid to anyone. No services were performed by any of the directors of the corporation, except the minor ones of collecting small sums on accounts which had been written off previously, and money received from cashing some bonds of the United States.

The contrast between the money value of these activities and the money value of the corporate activities before as shown by the balance sheets before March 31, 1944, and the subsequent balance sheets, shows how *minimal* the activities of the corporation were subsequent to liquidation. Illustrative is the fact that whereas the profits from sales in 1944 amounted to $599,072.96, there were none in 1945 or 1946. There is similar disparity in the total gross income, which, in 1944, was $631,310.30, $838.00 in 1945, and $345.12 in 1946. Equally eloquent is the showing as to net worth. As of October 31, 1945, it

was $11,472.76, and as of October 31, 1946, $25,206.20. The seeming increase of the net worth in 1946 over 1945 was not due to *any business operations*, but to the fact that the taxpayer had received during the year a refund of federal excess-profits taxes of $13,472.70, and a refund of California Franchise Tax in the sum of $204.12, to which was added a recovery of $150.00 on old debts. When from these totals there were deducted an additional federal income tax of $72.13, and a California Franchise Tax in the sum of $21.22, paid during the year, the increase in the net worth was accounted for.

There were no excess profits during the fiscal years 1945 and 1946. The only reason for filing a return was to have a basis for claiming an unused excess-profits credit carry-back.

All the operating properties and the offices of the corporation were turned over to the partnership,—the corporation for a short time retaining its office in the company building and storing its records on its premises. The only activities testified to by the officers of the corporation were those in conjunction with the preparation of claims for refunds alleged to be due. Under California law, such activities could have been carried on even after dissolution. Calif.Corp.Code, § 5400. And dissolution would not have affected any actual cases pending before any court or administrative agency relating to the property of the corporation. Calif.Corp. Code, § 5401.

It may be conceded that carry-backs will not be denied to a corporation

---

F.2d 578, 579, in which this court, under dissimilar tax situations involving transfer or distribution of assets of corporations, determined taxability according to the *actualities* involved. In the Gensinger case this court held that a corporation remained an entity despite dissolution because the filing of a notice of dissolution and the appointment of a "trustee in dissolution" *did not*, under Washington law, Rem.Rev.Stat. § 3802-

48 et seq., *effect* a dissolution and *was not* "intended to effect a present distribution of all corporate assets". At page 579. (Emphasis added.)

3. On the basis of this fact, the Supreme Court of California, in an action for personal injuries instituted against the corporation, held that the partnership became the *alter ego* of the corporation. Gordon v. Aztec Brewing Co., 1949, 33 Cal.2d 514, 521, 203 P.2d 522.

in the process of liquidation, if total liquidation is delayed for a reasonable length of time for the benefit of the corporation, and business activities continue to be carried on, even though to a lesser degree. Bowman v. Glenn, D.C. Ky.1949, 84 F.Supp. 200, affirmed sub nom. Glenn v. A. H. Bowman & Co., 6 Cir., 1950, 184 F.2d 670; Eastern Grain Elevator Corp. v. McGowan, D.C.N.Y. 1950, 95 F.Supp. 40; Aluminum Products Co. v. U. S., 1951, 101 F.Supp. 373, 121 Ct.Cl. 187. These cases recognize the principle promulgated in the regulations (Reg. 111, Sec. 29. 22(a)–20) that corporate existence may be continued for the purpose of "liquidating the assets and paying the debts", whether it be done under receivership, trusteeship or under direct statutory machinery. Here, the Commissioner allowed, and the Tax Court approved a finding that treated the corporation as a living entity to the end of 1944. There is no justification in law or in ethics for continuing such generous treatment during the years 1945 and 1946 in order to allow carry-back of hypothetical profits during a two-year period during which no *real corporate business* was carried on. The few matters that the officers attended to—so insignificant that they were not compensated during the period by the corporation,—could have been carried on after the filing of the dissolution certificate terminating the *de jure* existence of the corporation. The taxpayer, *for reasons of its own,* having chosen not to do so, should not be given the benefit of a carry-back available to *live, active business organizations.* That benefit is intended for corporations either actively engaged in business or engaged in *active* liquidation of their assets and payment of their debts while nonoperating. Here the taxpayer was a mere shell. It was not *operating or liquidating.* At most, it was receiving what, in the light of its assets before liquidation, was "petty cash" and asserting claims for tax refunds against federal and state agencies, which it could have done legally after completing dissolution.[4]

In sum, the taxpayer, when active, was engaged in the brewery business. Asserting tax refund claims before State and Federal administrative bodies is not doing the business for which the corporation was organized or liquidating such business under a state statute which commands that, upon filing of the notice of dissolution, "the corporation shall cease to carry on business except to the extent necessary for the beneficial winding up thereof".[5] After 1944, "there was no longer any valid reason for delaying dissolution"[6] for all its actual corporate operations had ceased, having been transferred to others. So the Tax Court was right in treating it as dissolved *de facto.*

The decision of the Tax Court is affirmed.

4. "On the other hand, as to the year 1944, it appears from the balance sheet at the end of 1943, that the liquidation had by the year's end progressed to the point where there was no longer *any valid reason for delaying dissolution,* and the *corporation,* though not dissolved de jure, must be regarded for the purpose of its claim to excess profits carry back for 1944, as de facto dissolved. For it must be remembered that *it is not necessary in Texas to delay dissolution until there has been a complete winding up.* Its tax statutes provide for the continuance of corporate existence for three years after dissolution for the purpose of enabling those charged with the duty to settle up its affairs." Wier Long Leaf Lumber Co. v. C. I. R., 5 Cir., 1949, 173 F.2d 549, 553. (Emphasis added.)

5. California Corporations Code, § 4605, formerly Calif. Civil Code, 1935 ed., § 400a (2).

6. Wier Long Leaf Lumber Co. v. C. I. R., supra, Note 4, loc. cit.