**UNITED STATES of America,**
**Plaintiff,**

v.

**CANFIELD DRIVEAWAY COMPANY,**
**Defendant.**

**Civ. No. 13505.**

United States District Court
E. D. Michigan, S. D.

Feb. 19, 1958.

Fred W. Kaess, U. S. Atty., and Willis Ward, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Foster, Meadows & Ballard, Detroit, Mich., for defendant.

O'SULLIVAN, District Judge.

Because this case has been on trial before a jury and it is necessary to make a disposition of various phases of it at this time, the Court is giving the following opinion, hastily prepared without opportunity for contemplative consideration of language or exhaustive review and citation of authorities. It is felt, however, that the Court's reasons for its present arrangement of this litigation should be recorded.

This is a suit by the United States of America against Canfield Driveaway Company to recover freight charges made by the defendant and paid by the plaintiff, claimed to have been in excess of the applicable maximum limitations on such charges. The amount of the original claim was $213,762.11. The defendant was a common carrier engaged in the transportation of motor vehicles by the driveaway method. It supplied drivers, gas and oil, and other service and materials incident to the transportation of vehicles. The services in question were performed during 1941, 1942 and 1943 and consisted of transportation of military vehicles at the request of the U. S. Government. At the beginning of the trial, the Government announced it was reducing its claim to a total amount of $120,324.17, and that those claims would be divided into two categories, namely, overcharges on transportation of motor vehicles over routes upon which there was an applicable "land-grant rate" (the overcharges in this category were $29,417.72) and, secondly, claims relating to overcharges for transportation of motor vehicles over routes which were not covered by "land-grant rates" (these items totalled $90,906.49). It is claimed by the Government that the latter shipments were all shipments made over routes within the certificate of authority of the defendant as a carrier.

Prior to trial, plaintiff had furnished to defendant a schedule containing details as to all of its overcharges. At the trial, however, the Government introduced in evidence new schedules, Exhibits RR and QQ, which showed the claimed overcharges on the land-grant and non land-grant shipments, respectively.

As a condition to doing business with the Government, the defendant was required to sign a contract referred to as a Standard Motor Freight Land-Grant Equalization Agreement. By this agreement, defendant agreed, "to protect the Government of the United States against any cost in excess of the lowest net land-grant charge lawfully available on such shipment from origin to destination at time of movement derived from lawful rates of common carriers filed with the Interstate Commerce Commission or appropriate State commission."

The Government introduced in evidence bills of lading, vouchers, and audit reports, the latter containing the computations whereby the General Accounting Office determined the amount of its claimed overcharges on the land-grant shipments. Similar exhibits were introduced disclosing the method whereby the General Accounting Office arrived at its claim of overcharges on non-land-grant shipments.

It appears that in the course of the business done by this defendant for the Government, it submitted its vouchers for payment to the Government, all of its charges being made in accordance with a document referred to as Government Rate Schedule No. 1. This will be discussed later. The Government paid all of the vouchers as presented, but thereafter the

General Accounting Office conducted an audit and arrived at its claim of overcharges. The Government asserts that it paid the bills presented by the defendant as required by Section 322 of the Transportation Act of 1940 (Title 49 U. S.C.A. § 66). While that Section reserves to the Government the right to deduct the amount of any determined overpayments from any amount subsequently due to the carrier, it must be assumed that at the time the General Accounting Office arrived at its determination of overcharges in this case, there were no further sums due the defendant from which these overcharges could be deducted.

In addition to introducing in evidence records of the General Accounting Office disclosing its determination of overcharges on land-grant shipments, the Government produced as a witness Edwin M. Singer, a rate expert from the General Accounting Office. He gave full testimony as to the method by which the General Accounting Office arrived at the overcharges on the land-grant shipments. No competent evidence was introduced by the defendant to challenge the correctness of the General Accounting Office figures or the testimony of Mr. Singer, except in the following respect: It was claimed that had these shipments, involved in this case, been made by railway carriers, the railroads would have had the right to make a charge for loading the vehicles into the railroad cars. Mr. Singer denied that such charges were ordinarily made a part of the railroad charges. The only evidence offered by the defendant to offset this testimony was identification of several tariffs published by some railroads indicating that if required by a shipper, a railroad would provide a loading service and make a charge therefor. The Court does not believe that this is of any consequence on this phase of the case, because evidence in the case is that where the Government shipped by railroad, it loaded its vehicles with its own personnel. The defendant likewise claimed that some of the land-grant shipments related to vehicles which were not properly covered by land-grant rates, and attempted to question Mr. Singer's computations in this regard. This Court, however, is not impressed that any evidence offered by defendant to overcome the Government's proof as to the validity of its overcharges insofar as land-grant shipments are concerned, was sufficient for that purpose.

The Court is of the opinion that the case of United States v. New York, New Haven & Hartford Railroad Co., 355 U. S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247, is controlling in this phase of the case. In dealing with a situation where the Government had, pursuant to Section 322 of the Transportation Act, arrived at an amount of overcharges and had deducted such overcharges from amounts subsequently due to the carrier, the Supreme Court held that the burden was upon the carrier to establish the correctness of its charges. This Court does not feel that this burden was met in this case by defendant and, in fact, no competent evidence was introduced which would bring into question the validity of the Government's claim.

It was asserted by defendant that some land-grant shipments were over routes not covered by the certificate of authority of defendant carrier. This would make no difference in this Court's opinion, as the land-grant agreement brought into being certain contractual obligations of the defendant which the uncontroverted evidence in this case indicates created a liability on the part of defendant to restore overcharges.

For the foregoing reasons, it is the Court's opinion that a verdict should be directed for the Government for the amount of the so-called "land-grant" overcharges in the sum of $29,417.72. This Court is of the opinion that that phase of this litigation is ready for entry of final judgment, and the Court is so ordering, in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The so-called "non land-grant" shipments present a different problem. All of the defendant's charges on these shipments were in accordance with a docu-

ment identified as Government Rate Schedule No. 1. This rate schedule was prepared by the National Automobile Transporters Association. It was never filed as a tariff with the Interstate Commerce Commission.

Leo A. Riegel, who was an officer in the Transportation Corps of the Army during the time in question, gave the background and history of this rate schedule. He claimed that in the beginning of the war driveaway companies, such as the defendant, were seeking Government business, and importuned army authorities to provide them with some of the Government's business in military vehicles. The defendant offered some evidence to the effect that the Army sought the aid of driveaway companies because there were not enough railway facilities to handle the Government's business. It is not important, however, to the solution of this problem to determine whether either of these circumstances brought about this situation, or whether both had something to do with it.

Mr. Riegel testified that in preparing to do business with the driveaway companies, a review of existing tariffs was attempted and there was found various conflicting rates in these numerous tariffs, and it would have been difficult for the Army to effectively handle its business if it had to cull from all of them for the purpose of finding out which one was most advantageous to the Government. It was his testimony that the transportation industry was given the responsibility of coming up with a price schedule which would take out of the existing tariffs the lowest rates available for the needed transportation, and which would be a simplified document upon which both the carriers and the Government could work. Apparently, both the military authorities and the carriers made extensive use of Government Price Schedule No. 1, and it was distributed, according, to Mr. Riegel, among Government agencies having to do with the problem. Mr. Riegel testified that while this price schedule was not filed with the Interstate Commerce Com-

mission, "it was filed under authority of law, Interstate Commerce Act, Section 22 [49 U.S.C.A. § 22]". This Court, however, finds that Price Schedule No. 1 was not such a filing as was permitted under Section 22, and from the evidence in this case it does not appear that this Government price schedule had any legal standing as a tariff usuable either by the Government or by the driveaway companies to arrive at correct charges for the shipments made. This is so because it has been found that Price Schedule No. 1 was, in fact, not a collection of valid rates contained in existing tariffs, and was not a schedule of reduced rates. It is, of course, difficult to understand why the Government authorities did not early recognize that Price Schedule No. 1 was not what they expected it to be. The existing and legally filed tariffs of these carriers used the cubic inch displacement of the motors covered by the tariff as the basis of arriving at rates. The Government Price Schedule No. 1 based its rates entirely on the weight of the vehicles to be transported. The Government, however, contends that it was the duty of the carriers to arrive at a price schedule that would contain rates no greater than existing tariffs; that they failed to do so and cannot claim any validity now for Price Schedule No. 1. The Court agrees with this position of the Government.

When the General Accounting Office proceeded to audit the non land-grant shipments, it used as the applicable tariffs two tariffs that were compiled and filed by the National Automobile Transporters Association. The Canfield Driveaway Company was a party to these tariffs. They were referred to in this litigation as Tariffs 74 and 79, and were Exhibits I and C, respectively. It was necessary for the General Accounting Office to refer to a Government manual wherein was contained a description of various motor vehicles used by the Army to determine their size and the cubic inch displacement of their motors. This information was necessary in order to apply the rates contained in Tariffs 74 and 79. These tariffs were applicable only to

transportation by the defendant, Canfield Driveaway Company, over routes permitted by its certificate of authority as a carrier.

The claims of the parties relating to this subject are as follows: The Government claims Tariffs 74 and 79 were the only valid existing tariffs and that the General Accounting Office correctly applied them to the shipments in question, and that the computation of the overcharges is correct. They claim that the burden now is upon the defendant to, itself, prove the correctness of the charges made. The Government asserts that this Court should direct a verdict for the full amount of these non land-grant claims and, if such a motion is not granted, it asks that the Court have the jury pass upon the validity of this part of its claim of overcharge.

The defense claims, first: That Government Price Schedule No. 1 was a valid tariff under Section 22 of the Transportation Act; and that, in any event, the question of whether or not Tariffs 74 and 79 could be applied to the shipments in question and whether, if applied, the conclusions of the General Accounting Office as to the claimed overcharges were correct, were matters that required the administrative investigation and determination of the Interstate Commerce Commission.

The Government's witness, Mr. Singer, did testify that in order to make his computations he had to interpret and construe the tariffs in question. He likewise testified that other persons of equal expertness with him might disagree with his conclusions and interpretations of the tariffs. He later testified, however, that his use of the words "construe" and "interpret" was not exact, and what he meant to say was that he had to "apply" the tariffs. The defendant produced expert witnesses who testified that a proper construction of these tariffs would disclose that they were not applicable to the type of motor vehicles that were transported by the defendant company; that Tariffs 74 and 79 were primarily designed to cover driveaway service on civilian vehicles; that the military vehicles were unusually heavy vehicles of unusual design and of such character as would require higher charges than those set forth in Tariffs 74 and 79. Evidence was introduced that in order to transport the Government vehicles extra care was required of the driveaway companies, such as providing armed guards, special protection of the vehicles en route and at stops, higher rates of insurance, and that the weight of these vehicles required a much higher consumption of gasoline than would have been required in transportation of vehicles described in Tariffs 74 and 79.

It was claimed by the defense witnesses that the charges made under Price Schedule No. 1 were reasonable and proper considering the added costs that resulted to the defendant from the special requirements. There was a great deal of testimony, expert and inexpert, upon these various subjects, and the Court is of the opinion that it would be not only difficult, but practically impossible for a jury to resolve the conflicting claims of the experts; and certainly the jury could not arrive at any intelligent conclusion as to the reasonableness of the charges made.

Even if we assume that Tariffs 74 and 79 were the only valid tariffs in existence during the time of the transportation in question, it seems to this Court that the application thereof in order to arrive at proper charges involves matters of expertness and interpretation which belongs peculiarly in the field of those expert in the matter of tariffs and their construction. Likewise, the Court feels that for it to make the interpretation and construction necessary to determine whether a verdict should be directed, or to come to a determination of what instructions to give to the jury, he would certainly need to be aided by the expertness that can be provided only by such an administrative agency as the Interstate Commerce Commission.

■ The Government makes the claim, however, that under the authority of United States v. New York, New Haven & Hartford R. R. Co., the burden was

upon the defendant in this case to establish the lawfulness of the charges it made, and that it failed to meet this burden. The resolution of this question is certainly not without great difficulty for this Court. Certainly the Court does not feel that the defendant has established the lawfulness of the charges it made. However, the Court feels that the defendant has shown that the determination of whether or not its charges were lawful, or whether or not the computation of overcharges by the Government is correct, requires investigation and determination by an administrative agency of the Government equipped to arrive at the needed conclusions. For that reason, the Court is of the opinion that the New York, New Haven & Hartford case is not controlling here. This is not a case where the carrier is suing to recover charges which it claims were lawful. It is, also, not a case where the Government has exercised its right to offset under Section 322. This is a case where the Government is seeking to recover from a carrier charges that it claims were illegal and excessive. Wherever lies the burden of proof in this case, it is the Court's opinion that the aid of an administrative agency is required.

The Court believes that the resolution of the problems presented does require interpretation and construction of the tariffs in question. The Court also believes that the questions relating to costs and other problems presented by the conflicting claims of the Government and the defendant relating to whether the tariffs apply at all and whether, in any event, a proper interpretation was made of them by the General Accounting Office, calls for aid by the expertness of the Interstate Commerce Commission.

The Supreme Court of the United States, in the case of United States v. Western Pacific R. R. Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126, indicated its desire to eliminate any confusion that existed theretofore in connection with the question of primary jurisdiction of the courts and proper division between the courts and the administrative agencies in determining matters such as are involved in this litigation. In that case, the Court of Claims, 131 F.Supp. 919, 132 Ct.Cl. 115, had before it a case where the United States Government, on a post audit, had determined that it had been overcharged by certain rail carriers. The railroads sought to recover these overcharges in proceedings before the Court of Claims. The railroad had made its charge for certain shipments upon its claim that the commodities carried were what was known as incendiary bombs, within the meaning of Item 1820 of a published tariff. The Government claimed that the shipments, "were not, in fact, such; but that if they were such, the rates charged for their transportation was unreasonable". The Court of Claims held it had the power to construe the tariff to determine whether the shipments in question were, in fact, incendiary bombs within the meaning of Item 1820 of the tariff, but held that the Government's second contention, namely, the reasonableness of the tariff as applied to shipments, was within the initial competence of the Interstate Commerce Commission.

In the Supreme Court, neither side questioned the validity of the lower court's view in this respect. The Supreme Court, however, disagreed and said:

"Nevertheless, because we regard the maintenance of a proper relationship between the courts and the Commission in matters affecting transportation policy to be of continuing public concern, we have been constrained to inquire into this aspect of the decision. We have concluded that in the circumstances here presented, the question of tariff construction, as well as that of reasonableness of tariff as applied, was within the exclusive primary jurisdiction of the Interstate Commerce Commission." 352 U.S. at page 63, 77 S.Ct. at page 165.

The Court, at some length, reviewed the rationale of various decisions made upon this subject, and said further:

"No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."

The Supreme Court went on to quote, with approval, from Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576, wherein the Supreme Court referred to the principle:

"Now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating such matter should not be passed over."

The Court went on to say:

"The doctrine of primary jurisdiction thus does 'more than prescribe the mere procedural time table of the law suit. It is a doctrine allocating the law-making power over certain aspects' of commercial relations. 'It transfers from court to agency the power to determine' some of the incidents of such relations."

Again, in the Western Pacific case, the Supreme Court made reference to the similar case of Texas & Pacific R. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255. In that case, the shipper attempted to ship oak railroad ties under a tariff for lumber. The question was whether such ties were lumber within the meaning of the tariff. The Court said:

"In a damage action expert testimony was received on the question. This Court, however, held that the Interstate Commerce Commission alone could resolve the question. The effect of the holding is clear: the courts must not only refrain from making tariffs, but, under certain circumstances, must decline to construe them as well." 352 U.S. at page 65, 77 S.Ct. at page 166.

The following language in 352 U.S. at page 66, 77 S.Ct. at page 166, appears to this Court to be expressly applicable to the evidence in the case at Bar:

"But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the inquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the Commission. The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts.' * * * We must, therefore, decide whether a determination of the meaning of the term 'incendiary bomb' in Item 1820 involves factors 'the adequate appreciation of which' presupposes an 'acquaintance with many intricate facts of transportation.' We conclude that it does."

Notwithstanding this late pronouncement by the Supreme Court of this doctrine, this Court finds it difficult to apply it in the case at Bar. This is a law suit in a District Court and the United States Government is here as a plaintiff and has not previously resorted by complaint to the Interstate Commerce Commission. It insists that it has no occasion to require the service of the Interstate Commerce Commission because it is satisfied that the conclusions of its General Accounting Office are valid and binding. If this Court now dismissed the Government's case and relegated it to complaint before the Interstate Commerce Commission, the Government would no doubt be barred by the two-year Statute of Limitations. If compelled, however, by this Court's order, to join in a reference of this matter to the Interstate Commerce Commission, the two-year Statute of Limitations would

not apply. United States v. Western Pacific R. Co., supra, 352 U.S. pages 70–74, 77 S.Ct. 161.

In the two cases decided the same day, United States v. Western Pacific, supra, and United States v. Chesapeake & Ohio R. Co., 352 U.S. 77, 77 S.Ct. 172, 1 L.Ed. 2d 140, the Government, which had deducted overcharges, was the moving party to have the question of reasonableness of rates and tariff construction referred to the Interstate Commerce Commission, although in the Western Pacific case, it contended that the Court could construe the meaning of the term "incendiary bomb".

In this case, however, it is the carrier, whose charges have been paid in full, who insists that a reference be made. The Court cannot find a spelling out of procedure whereby a carrier situated as the defendant in this case, would initiate a proceeding before the Interstate Commerce Commission. I do not find any decided case in which the application of the doctrine of primary jurisdiction applies, with the procedural background of the case at Bar. Notwithstanding, however, that there seems to be no well-defined procedural path to follow, if the doctrine of the Western Pacific case is to be followed, this Court should not be helpless merely because he does not find a Court rule or procedural statute which gives specific direction as to how to proceed.

The following language of Justice Frankfurter, although contained in his dissent, in the case of Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, page 261 et seq., 71 S.Ct. 692, 700, 95 L.Ed. 912, is appropriate here, and in this regard, his language need not be considered as a dissent:

"Courts, unlike administrative agencies, are organs with historic antecedents which bring with them well-defined powers. They do not require explicit statutory authorization for familiar remedies to enforce statutory obligations. * * * A duty declared by Congress does not evaporate for want of a formulated sanction. When Congress has 'left the matter at large for judicial determination', our function is to decide what remedies are appropriate in the light of statutory language and purpose and of the traditional modes by which courts compel performance of legal obligations. * *"

In that case, the administrative agency was the Federal Power Commission, but the general principle is applicable here. Justice Frankfurter went on to say:

"In a variety of situations we have recently emphasized the principle that courts and agencies 'are to be deemed collaborative instrumentalities of justice'. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1005, 85 L.Ed. 1429; Id., 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211; Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93. To that end it is established practice that courts may entertain actions brought before them, but call to their aid the appropriate administrative agency on questions within its administrative competence. * * In the Eldorado Oil Works litigation [General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361] we held that proper procedure required the District Court to entertain a suit on a contract but to look to the Interstate Commerce Commission for guidance as to transportation practices involved in carrying out the contract. * * * The fact that the Federal Power Commission is not itself authorized to award damages does not disable it from advising a court on questions on which its judgment is needed."

The Interstate Commerce Commission has, itself, reviewed this question of the right of a court to seek the aid of the Interstate Commerce Commission in connection with litigation pending in the District Court. Bell Potato Chip v. Aberdeen, 43 M.C.C. 337.

Certainly this Court believes that in order to resolve the questions presented by the non land-grant claims, it needs the aid of the Interstate Commerce Commission. This help is needed on construction of the tariffs, reasonableness of rates, costs allocation and other matters. The Court believes that the following language from General American Tank Car Corp. v. Eldorado Terminal Co., 308 U.S. 522, at page 433, 60 S.Ct. 325, at page 331 applies to the present situation:

"When it appeared in the course of the litigation that an administrative problem, committed to the Commission, was involved, the court should have stayed its hand pending the Commission's determination of the lawfulness and reasonableness of the practices under the terms of the Act. There should not be a dismissal, but, as in Mitchell Coal & Coke Co. v. Pennsylvania R. Co., supra, (230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472) the cause should be held pending the conclusion of an appropriate administrative proceeding."

This Court has been troubled with the question of what mechanism should be employed to invoke the aid and investigation of the Interstate Commerce Commission. Ordinarily, such an investigation would have its beginning in a complaint by a shipper claiming to have been overcharged. In the case of United States v. Western Pacific and United States v. Chesapeake & Ohio R. Co., the party seeking a referral was the shipper, the United States Government. In the case at Bar, the party asking for a referral is the carrier who in this litigation, claims its charges were valid. No case has been cited to the Court wherein the precise procedure to be employed in making such a referral is announced. However, inasmuch as defendant is here asking for such a referral, the burden of initiating the procedure to invoke the aid of the Interstate Commerce Commission would be upon it. It would seem that Section 304(c) of the Interstate Commerce Act, Title 49 U.S.C.A. § 304, could be used by the defendant carrier. But, in any event, the want of a statutory spelling out of procedural method will not prevent this Court from making the referral, which it feels it should.

Precedent for the Interstate Commerce Commission processing such a referral is found in the case of United States of America v. Davidson Transfer & Storage Company, Inc., et al, M.C.C. 1849, decided October 14, 1957.

In that case, a carrier paid a claimed overcharge asserted by the Government, and then brought a Federal court action for recovery of such claimed overpayments. It was alleged that the United States General Accounting Office cannot usurp the exclusive prerogative of the Interstate Commerce Commission to determine the reasonableness of motor carrier rates. The carrier in that proceeding obtained a stay of the Court, pending determination of the issue in the complaint by the Commission. In that case it will be seen that the carrier was the party initiating the reference. The Interstate Commerce Commission held that it had jurisdiction and said:

"We adhere to the position we have consistently followed in the Bell Potato case, supra, and similar cases. In keeping with established principle that the question of reasonableness is for the Commission and not the courts. U. S. v. Western Pacific, 352 U.S. 59, 64, 68 [77 S.Ct. 161, 1 L.Ed.2d 126], Chip case, supra, and similar cases. In keeping and in consideration of the powers expressly conferred by, and which may reasonably be implied from, the Interstate Commerce Act, we conclude that in this proceeding we may determine the reasonableness of the rates charged in aid of the court actions previously filed."

If the parties cannot agree upon a form of order, this Court will construct what it considers an appropriate one.