FLEET CARRIER CORPORATION, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 80911.   Filed December 22, 1961.

*George E. Clary, Esq.*, and *Richard E. Garley, Esq.*, for the petitioner.

*Colin C. Macdonald, Esq.*, for the respondent.

FISHER, *Judge:* The respondent has determined a deficiency in petitioner's income tax for the year 1953 in the amount of $59,845.51. The sole issue before us is whether the amount of $72,982.33, which was paid by petitioner in 1953 in settlement of a Government claim that it had been charged and paid $145,964.65 in excess of the lowest legal rate for services performed by petitioner for the Government in 1943 and 1944, is deductible by the petitioner in 1953.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner, Fleet Carrier Corporation, is a corporation organized under the laws of the State of New York. Its income tax return for the calendar year 1953, the only period here involved, was filed with the director of internal revenue for the Lower Manhattan District of New York. The petitioner at all times has kept its records and filed its Federal income and excess profits tax returns on an accrual basis.

During the years 1943 and 1944, and at all times since then, petitioner has been a common (motor) carrier duly licensed to engage in

the business of transporting motor vehicles within the United States and subject to the jurisdiction of the Interstate Commerce Commission.

Prior to World War II, petitioner's business was principally the transportation of trucks, buses, and other motor vehicles from the plants where such vehicles were manufactured. Its principal operation was a driveaway service for the Coach and Truck Division of General Motors at Pontiac, Michigan. Over 99 percent of its business was thus contributed by the one shipper and not over 1 percent was shipped for the general public.

The vehicles transported were primarily chassis for trucks and buses which were normally shipped in a combination of two or three vehicles and transported by one driver.

The freight rates which petitioner charged for such business were based upon tariff schedules worked out by the motor carriers and their association and the principal shippers, and then filed with the ICC. After 30 days such filed tariffs unless otherwise ordered by the ICC became effective on the specified effective date, and were binding thereafter on the carriers and the shippers.

During all times material here there were in effect certain filed tariffs in which petitioner participated, setting forth the rates it (and other motor carriers) was entitled to charge for specific transportation services for specified types of motor vehicles between specified points in the United States. The tariff in effect in 1941 was known as the Courtney Tariff 1–B. This tariff based its rates upon the cubic inch displacement of the motors of the vehicles transported. No provision was made in the tariff limiting the coverage to non-Government vehicles.

In the latter part of 1941, with the advent of the war, petitioner, as well as other motor carriers, was requested to perform transportation services for the Government. The Quartermaster Corps of the War Department, however, considered the tariff rate then in effect at that time (Courtney Tariff 1–B) unsuitable for the transportation of the Government vehicles. The War Department, therefore, requested that the motor carriers (including petitioner) prepare a tariff which would encompass all the Government traffic and establish rates based upon the weight of the vehicles. This was requested to enable the Government to compare the motor carriers' rates against those charged by the railroads which were already based upon the weight of the vehicles transported.

In response to the request of the War Department, the motor carriers association and the Government agencies worked out a schedule based upon the weight of the vehicles and designated for use in performing motor transportation services for the Government. This

schedule, designated Government Rate Schedule No. 1, was intended to be effective on October 25, 1941. At the request of the War Department this schedule was not filed with the ICC as the War Department wanted to keep it on a flexible basis until both sides had some experience in its use. Consequently, this schedule was never given the legal effect of a rate schedule under the terms of the Interstate Commerce Act. The Government rate schedule did not in any way affect the legality or applicability of the Courtney Tariff 1–B.

Subsequent to the adoption of the Government Rate Schedule No. 1, Courtney Tariff 1–B was expressly superseded by Courtney Tariff 1–C, which was filed and became effective on February 4, 1942. This tariff, also based on the size of the motor of the vehicle transported, did not limit its coverage to non-Government vehicles. This tariff was the only schedule of rates filed by petitioner during 1943 and up to October of 1944.

The transportation services which the motor carriers performed for the War Department differed substantially from the civilian business upon which the Courtney rates were intended. Government vehicles were of a different type of construction, were greater in weight, required more operating skill, and were of greater value. Also, the method of handling military vehicles was different. Each military vehicle had to be driven singly in convoys with special guards, while the civilian transportation was made in combinations. Therefore, petitioner, as well as the other carriers, was confronted with increased operating costs arising out of gasoline consumption, drivers' wages, and liability when transporting Government vehicles.

Recognizing that the Courtney Tariff 1–C was the only legally effective rate in 1943 while the Government transportation during that year would be based on a separate unfiled schedule, a Supplement No. 8 to the Courtney Tariff 1–C was filed and made effective January 6, 1943. This amendment expressly provided that the Courtney Tariff 1–C would not thereafter apply to the transportation of military or Government vehicles. It was expressly stated that all Government transportation would be based upon the Government Rate Schedule No. 1 and supplements thereto.

After a year's experience under the Government Rate Schedule No. 1, it was felt that enough experience had been accumulated and a new Government tariff known as Tariff No. 80 was filed with the ICC, becoming effective October 9, 1943. This tariff, however, in no way altered the effectiveness of the Courtney Tariff 1–C which was also then filed.

When the petitioner rendered transportation services for the Government, the service was initiated by a transportation officer at the Government installations who would issue a Government bill of lad-

ing. These bills of lading constituted the only contracts with reference to the transportation of vehicles by the petitioner for the Government agencies. The bills of lading did not specify any freight rate for any particular shipment. It was, however, provided in the bills of lading that it was mutually agreed and understood between the United States and carriers that certain general conditions prevailed, among which were the following:

2. Unless otherwise specifically provided or otherwise stated hereon, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier.

3. Shipment made upon this bill of lading shall take no higher rate than would be charged had the shipment been made upon the uniform straight bill of lading or uniform express receipt.

It was understood, however, between petitioner and the Government that the charges for these shipments would be those shown in the Government Rate Schedule No. 1 and the later filed Tariff No. 80. Petitioner would not have undertaken these services if it had not so understood.

The Courtney Tariff 1–C and the Government tariffs produced widely different rates for the same vehicle. Transportation charges for a War Department vehicle weighing 20,000 pounds but having the same motor as a 5,000-pound nonmilitary vehicle would be 80 percent more under the Government rates (based on weight) than the Courtney Tariff (based on motor size).

After each service was performed, petitioner submitted a voucher to the various Government agencies for transportation services rendered. The charges in these vouchers were computed on the basis of the Government Rate Schedule No. 1 or the later filed Tariff No. 80.

Upon receipt of these vouchers, the Government agencies for whom the services were performed made no objection to the charges so computed and made such payments accordingly.

The total of the charges (based upon the Government schedules) for the transportation services for the Government in 1943 and 1944 was accrued by petitioner on its books in the years 1943 and 1944, and was included in petitioner's gross income on its Federal income and excess profits tax returns for those years.

After the war an audit was made by the Comptroller General of the United States of the vouchers received from petitioner for services rendered, and it was determined that petitioner (as well as other carriers in a like position) had overcharged the Government for transportation services during the war. The basis for this claim was that in a great many instances particular transportation service rendered could have been brought within the Courtney Tariffs, thus providing a lower freight rate than that provided in the Government rate schedules. It was also determined that the Government Supplement 80

which was filed with the ICC could not be binding when another legally filed schedule which also covered the same vehicles provided a lower rate. In essence, it was determined that a carrier could not legally charge the Government a higher freight rate than that provided in any effectively filed tariff which produced a lower rate, and that no Government agency had the power to bind the Government to pay a higher rate. It was also determined that the attempt to restrict the Courtney Tariff 1–C to non-Government vehicles was ineffective inasmuch as carriers could not, by merely distinguishing between ownership, establish different rates. These views were explained at length in a letter written by the Comptroller General to the Secretary of War under date of July 31, 1946, and in a later letter of May 6, 1947, affirming his position.

On November 12, 1948, the Comptroller General thereupon issued a "Certificate of Settlement" finding that the sum of $237,280.50 was due the United States arising out of such overcharges paid to petitioner during the years 1942 through 1945. This overcharge claim was later increased to $268,653.17. Petitioner in 1950 and 1951, after negotiation with the Department of Justice, paid to the United States the sum of $77,500 in full settlement of the aforementioned claim.

On December 14, 1953, the Comptroller General issued a "Certificate of Indebtedness" setting forth additional overcharges for services rendered during the years 1943 and 1944 in the total of $145,964.65. The basis for such claim was stated as follows:

Under the provisions of section 322 of the Transportation Act of 1940, 54 Stat. 955, payment for the transportation of property or persons for or on behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended, is required to be made upon the presentation of bills therefor by the carrier, prior to audit or settlement by the General Accounting Office, but the right is reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier.

Pursuant to this legislation, payment was made to the debtor for freight transportation furnished during the years 1942, 1943, and 1944 which, upon audit by the General Accounting Office, was found to have resulted in the debtor carrier being overpaid as set forth in detail in General Accounting Office Forms 1003, copies of which were furnished the debtor. The overpayments are shown on the attached pages.

| | |
|---|---|
| 1943 | $97,669.28 |
| 1944 | 48,295.37 |
| | $145,964.65 |

In settlement negotiations with the Department of Justice, petitioner on December 16, 1953, offered the sum of $72,982.33 in full settlement of the claim. Such offer was accepted by the Department of Justice on December 29, 1953, and payment thereof was made by petitioner to the Government prior to December 31, 1953.

Both of the claims by the Government (made in 1951 and 1953) for overcharges represented amounts which had previously been reported by petitioner as income earned in 1943 and 1944. The totals of the alleged overpayments which were previously reported in each year as income, together with petitioner's net income, which included these amounts (as audited but not subsequently adjusted by respondent), and its income and excess profits taxes for those years, are as follows:

|  | Overcharged | |
|---|---|---|
|  | *1943* | *1944* |
| 1951 claimed | $107,640 | $114,902 |
| 1953 claimed | 116,606 | 29,358 |
| Total claimed overcharge | 224,246 | 144,260 |
| Net income (including above amounts) | 14,557.20 | [1] 2,211.21 |
| Income tax | 2,722.51 | 552.80 |
| Excess profits tax | 3,350.02 | ———— |

[1] After deduction of a net operating loss carryback from 1946 of $18,036.80.

If the totals of the claimed overcharges had never been included in income for 1943 and 1944, petitioner would have sustained substantial deficits for both of these years.

On its Federal corporation income tax return (Form 1120) for the calendar year 1953, petitioner deducted the amount of the 1953 settlement of $72,982.33. Respondent disallowed the entire deduction for the year 1953 on the ground that such amount is not deductible as a business expense under section 23 of the 1939 Code or any other provision of the Code.

OPINION.

As an interstate carrier, petitioner has at all times here in issue been subject to the ICC. Its transportation rates, therefore, are uniformly established, and such rates may not be modified at will. The rights and obligations of petitioner concerning its rates have been succinctly stated by the Supreme Court of the United States in *T.I.M.E., Inc.* v. *United States*, 359 U.S. 464 (1959), as follows (p. 465):

> Petitioners are interstate motor common carriers, certificated by the Interstate Commerce Commission (I.C.C.) under the Motor Carrier Act of 1935. Section 217 of that Act, 49 U.S.C. § 317, requires such carriers to file their transportation charges as tariffs with the I.C.C. These tariffs remain effective until suspended or changed in accordance with specified procedures, and so long as they are effective carriers are forbidden to charge or collect any rate other than that provided in the applicable tariff.

In 1953, the Comptroller General determined that the Government had paid in excess of the legal rate for services rendered by petitioner in 1943 and 1944, and sought to recover such excess. The claim was based solely upon a determination of the lowest applicable legal rate

in effect·in 1943 and 1944 compared to the amount paid, and no claim was ever based upon the allegation that petitioner had earned excessive profits on such service, nor was any attempt made to initiate renegotiation proceedings of any type. A settlement was effected between petitioner and the Department of Justice pursuant to which petitioner paid $72,982.33 in 1953, in full satisfaction of the claim of $145,964.65. Petitioner deducted the total paid on its Federal income tax return for 1953 and it was disallowed by the respondent.

The legality of the Comptroller General's claim against petitioner is not questioned and is not here in issue. See *United States* v. *Keal*, 141 F. Supp. 827 (N.D. Ohio 1956); *United States* v. *Canfield Driveaway Company*, 159 F. Supp. 448 (E.D. Mich. 1958).

The sole basis for the disallowance of the deduction by respondent is his contention that such deduction is specifically disallowed by section 3806(a)(3) of the 1939 Code. Section 3806 provides, as far as material here, as follows:

SEC. 3806. MITIGATION OF EFFECT OF RENEGOTIATION OF WAR CONTRACTS OR DISALLOWANCE OF REIMBURSEMENT.

(a) REDUCTION FOR PRIOR TAXABLE YEAR.—

(1) EXCESSIVE PROFITS ELIMINATED FOR PRIOR TAXABLE YEAR.—In the case of a contract with the United States or any agency thereof, or any subcontract thereunder, which is made by the taxpayer, if a renegotiation is made in respect of such contract or subcontract and an amount of excessive profits received or accrued under such contract or subcontract for a taxable year (hereinafter referred to as "prior taxable year") is eliminated and, in a taxable year ending after December 31, 1941, the taxpayer is required to pay or repay to the United States or any agency thereof the amount of excessive profits eliminated or the amount of excessive profits eliminated is applied as an offset against other amounts due the taxpayer, the part of the contract or subcontract price which was received or was accrued for the prior taxable year shall be reduced by the amount of excessive profits eliminated. For the purposes of this section—

(A) The term "renegotiation" includes any transaction which is a renegotiation within the meaning of the Federal renegotiation act applicable to such transaction, any modification of one or more contracts with the United States or any agency thereof, and any agreement with the United States or any agency thereof in respect of one or more such contracts or subcontracts thereunder.

(B) The term "excessive profits" includes any amount which constitutes excessive profits within the meaning assigned to such term by the applicable Federal renegotiation act, any part of the contract price of a contract with the United States or any agency thereof, any part of the subcontract price of a subcontract under such a contract, and any profits derived from one or more such contracts or subcontracts.

\*     \*     \*     \*     \*     \*     \*

(3) DEDUCTION DISALLOWED.—The amount of the payment, repayment, or offset described in paragraph (1) or paragraph (2) shall not constitute a deduction for the year in which paid or incurred.

Both parties agree that if the above section is not applicable to the payment in issue, the entire amount paid by petitioner to the Government in 1953 would be deductible in that year. See *United States* v. *Lewis*, 340 U.S. 590 (1951).

In order to properly construe the exact words of section 3806, it is pertinent to first ascertain its general purpose and scope.

In 1942, with the prospect of excessive profits being earned by contractors doing business with the Government, the first Renegotiation Act was enacted in sections 401 to 403 of the Sixth Supplemental National Defense Appropriation Act of 1942. These sections directed certain Government officials to insert in any contract in excess of $150,000 thereafter made a provision for renegotiation of the contract price whenever the Secretary of the Department determined, in his opinion, that excessive profits have been realized or are likely to be realized from any contract, and to require the contractor to renegotiate the contract price and to recover any such amount which had been already paid to the contractor. The statute, however, made no provision concerning the taxability or deductibility in any year of the excessive profits repaid to the Government pursuant to a renegotiation proceeding. In the absence of any statutory provision, the so-called claim of right doctrine presumably would have allowed a deduction for the amount repaid in the year of repayment. No consideration would have been given to the amount of tax paid by the contractor for the years in which such eliminated excessive profits were originally reported. See *North American Oil* v. *Burnet*, 286 U.S. 417 (1932); *United States* v. *Lewis*, 340 U.S. 590 (1951).

The Internal Revenue Service in an effort to treat excessive profits eliminated pursuant to a renegotiation of a Government contract differently from amounts received under a "claim of right" issued a ruling directed specifically to the tax treatment of such eliminated excessive profits. This ruling, I.T. 3577, 1942-2 C.B. 163, provides as follows:

Advice is requested as to the policy of the Bureau of Internal Revenue with respect to the adjustment of income and excess profits taxes in cases in which Government war contracts are renegotiated and it is determined by the renegotiating department or agency that excessive profits have been, or are likely to be, paid to the contractor * * *.

\* \* \* \* \* \* \*

In case the renegotiating agreement provides for reduced contract prices to be retroactively applied to *prior taxable years for which returns have been filed and the income and excess profits taxes paid or assessed*, repayment to the Government of the excessive profits *on which such taxes have been paid or assessed* will be involved in the settlement. This raises the question, "If the contractor or subcontractor repays the entire amount of such excessive profits to the Government, should the Bureau be required to refund the income and excess profits taxes paid on such excessive profits?" The position of the Bureau is that only the amount of such profits *in excess of the Federal income and excess*

*profits taxes paid or assessed thereon* should be repaid by the contractor or sub-contractor, and no refund or abatement of such taxes should be made, since the taxes should be considered as a recapture of a portion of the excessive profits and as such a proper offset against the total excessive profits. The remainder of the excessive profits would be recaptured through repayment thereof to the Government by the contractor or subcontractor. The repayment should not be allowed as a deduction in the income and excess profits tax returns of the tax-payer for any taxable year. To do so would result in a double tax benefit where the income and excess profits taxes have been offset against the excessive profits. * * *

Section 3806 was thereafter added to the 1939 Code by the Revenue Act of 1942 in order to effectuate this ruling into law. S. Rept. No. 1631, 77th Cong., 2d Sess., sec. 507. It is, therefore, apparent that the sole intent of Congress in enacting section 3806 was to provide for the tax treatment of eliminated excessive profits in a renegotiated Government contract. A careful review of the legislative history discloses no other broader purpose. Indeed, the almost total lack of explanation in the committee reports concerning section 3806 was evidently caused by a belief that the scope and content of the ruling and the statute were clear and unambiguous.

No evidence of congressional intent concerning the specific situation herein in issue manifested itself until 1958. While subsequent legis-lative history may not be decisive, it may be considered to assist in the interpretation of prior legislation upon the same subject. *Great Northern Ry. Co.* v. *United States*, 315 U.S. 262, 277 (1942).

Section 3806 of the 1939 Code was substantially reenacted as section 1481 of the 1954 Code. In addition, Congress obviously dissatisfied with the results reached in *United States* v. *Lewis, supra,* enacted sec-tion 1341, providing for the computation of tax where a taxpayer re-stores a substantial amount held under a "claim of right."

The question of whether the amounts involved should be treated as the restoration of amounts held under a "claim of right" under *United States* v. *Lewis, supra,* or under section 3806 of the Code of 1939, is the same as whether, if it had arisen under the 1954 Code, section 1341 ("claim of right") or section 1481 (the successor to section 3806) would be applicable.

This question was impliedly answered by a committee report con-cerning the 1958 amendment to section 1341, where it was stated:

Cases have been called to your committee's attention where railroads have included amounts in income during World War II which they received from military shipments. This income was taxed under the excess-profits tax at rates as high as 85 percent. Now the railroads are being required to repay part of these receipts to the Government because a lower freight rate should have been applicable. Because of security restrictions during World War II, how-ever, the railroads were unable in many cases to determine that these lower rates were applicable.

To correct this inequity, your committee has amended present law (sec. 1341) so that the term "prior revenue laws" includes taxes imposed by chapter 2 of the 1939 Code, or the World War II excess-profits tax. Your committee has made this amendment applicable to taxable years beginning after December 31, 1953, and ending after August 16, 1954, the general effective date of the income taxes under the 1954 Code.

S. Rept. No. 1983, 85th Cong., 2d Sess., pp. 82–83 (1958).

It is important to note that the amendment did not provide for the inclusion of the present situation within the coverages of section 1341. The amendment changed the section merely to enlarge the remedy which theretofore had been incomplete.

The implication is clear that Congress had in mind the view that the "claim of right" doctrine was applicable, and there is no indication that Congress has ever deemed that the situation presented to us would fall in any category other than restoration of amounts held under a claim of right.

A renegotiation is the redetermination of a contract price in the light of later actual experience in order to eliminate excessive profits which were created under the original contract price. This redetermination or modification of the original valid contract price is made either by agreement between the parties or by a board in a formal hearing. The parties agree that there was no element of excessive profits involved here, nor was there any formal hearing. Indeed, petitioner's total income during the years 1943 and 1944 even including the alleged excessive rates was relatively small, and petitioner would have incurred large deficits during both of those years had it not originally accrued these amounts in income. The "Certificate of Indebtedness" also clearly belies any inference that a renegotiation of a contract was sought by the Government. The claim merely states that the Government had paid in excess of the legal rate and that it seeks a refund. There was no discussion of a fair or excessive profit which is normally attendant upon a renegotiation of a contract.

Respondent, nevertheless, maintains that the definitions contained in section 3806 of the terms "renegotiation" and "excessive profits" make the section sufficiently broad to encompass the situation presented here and do not limit it to the typical renegotiation situation.

"Renegotiation" is defined in the section as including "any modification of one or more contracts with the United States or any agency thereof, and any agreement with the United States or any agency thereof in respect to one or more such contracts." "Excessive profits" is defined as including "any part of the contract price of a contract with the United States or any agency thereof."

The question to first arise is whether the contracts here involved were ever modified within the meaning of the section. The term

"modification" implies a mutual assent of the parties to a contract to vary or alter in some manner the terms of the contract. It implies the acceptance by both parties of the original contract as the valid starting point with an adjustment of it for some reason. This was not the situation here. The Government, under its right to be charged the lowest legally filed rate, completely disregarded and set aside the old contract rates, substituting the legal rates in their stead. While the contract price was changed it was done pursuant to the exercising of a legal right rather than pursuant to a mutual agreement to alter the contract price. We do not believe that the setting aside of an illegal rate in favor of a legal rate can be considered a "modification" within the meaning of the section.

Nor do we believe that there was an agreement between the parties with respect to the contracts. Indeed, no agreement was necessary in order to change the contract prices, inasmuch as the Government was legally bound to pay only the legal rates regardless of any prior agreements. The only agreement made by petitioner with the Government concerned, not the contracts, but the settlement of a legal claim which the latter held against petitioner because of the overcharges.

The second question is whether part of the contract prices were ever eliminated. Here again, it is implied that the initial price be accepted as valid by both parties with a portion of it returned because of being excessive. This was not done here. Instead, the original price, being illegal and unaccepted, was completely eliminated and a new price, having no relationship whatever to the original price, was substituted in its stead. There was no element of excessive prices or profits attendant to the transaction. While it is true that the new rates were lower than the original rates, this was not caused by an elimination or reduction of the old rates for any reason, but, by a complete substitution of the legal rates for the old rates.

While the definitions contained for the terms "renegotiation" and "excessive profits" are broad, they must still be interpreted in the light of the terms which they are defining, keeping in mind the purpose of the entire section. We do not believe that section 3806, even with the broad definitions contained therein, was intended to cover the situation presented here. The legislative history of the section, together with the ruling upon which the section was based, clearly indicates that the section was intended to apply only to excessive profits eliminated under some type of renegotiation proceeding or agreement. Section 403 of the Sixth Supplemental Defense Appro-

priation Act narrowly defines "renegotiation" as "the refixing by the Secretary of the Department of the contract price." Inasmuch as many Government contracts are renegotiated informally without such formal determination, the inclusion of the broad definition of the term "renegotiation" in section 3806 indicates an apparent intention to extend the "mitigating" tax effect of section 3806 to the situation where only an informal renegotiation took place. The situation presented here concerns a repayment based only on a legal claim of overpayment. To apply section 3806 to this situation would extend its coverage to unwarranted limits.

Respondent relies heavily upon his own ruling, I. T. 3671, 1944 C.B. 465, which states, in part, as follows:

> It is held that the term "renegotiation," for the purposes of section 3806 * * *, is not limited to a renegotiation within the meaning of section 403 of the Sixth Supplemental National Defense Appropriation Act * * *. It includes an agreement in writing made in respect of one or more Government contracts or subcontracts thereunder, and may be effected by an exchange of correspondence which embodies a binding agreement by both parties as to the amount repaid or to be repaid and the year to which the repayment relates. * * *

Assuming that the ruling is a correct statement of the law, we still do not agree that the instant situation comes within its scope. The ruling (like the broad definitions contained in section 3806) apparently is intended to cover the situation where there is no formal renegotiation proceeding and no determination of the contract price by a Government official, but only an informal modification of the legal contract price by agreement between the parties. The ruling still presupposes a valid contract price which is altered for some reason by the parties. As stated above, no valid contract price was ever modified here. The only agreement between the parties was to settle a legal claim which the Government held against petitioner on the basis that it had paid in excess of the legal rate. There was never any agreement concerning the alteration of any valid contract price.

We conclude, therefore, that section 3806 does not apply to the instant case inasmuch as there was not involved here any renegotiation or modification of any legal contract price, but merely an agreement to settle a legal claim of the Government to recover amounts paid by it in excess of the legal contract price. The entire amount paid by petitioner is deductible, therefore, in 1953 as money originally received under a "claim of right" and subsequently repaid.

*Decision will be entered under Rule 50.*